**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

MARK ALAN BRADFORD,
*Petitioner-Appellant/*
*Cross-Appellee*,

v.

RON DAVIS, Warden, California
State Prison at San Quentin,
*Respondent-Appellee/*
*Cross-Appellant.*

Nos. 15-99018
15-99019

D.C. No.
2:97-cv-06221-
TJH

OPINION

Appeal from the United States District Court
for the Central District of California
Terry J. Hatter, District Judge, Presiding

Argued and Submitted February 28, 2019
Pasadena, California

Filed May 3, 2019

Before: MILAN D. SMITH, JR., PAUL J. WATFORD,
and ANDREW D. HURWITZ, Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.

# SUMMARY[*]

## Habeas Corpus / Death Penalty

The panel affirmed the district court's denial of habeas relief as to one of Mark Alan Bradford's claims regarding his conviction, reversed the district court's procedural-default holding as to two claims regarding his conviction, remanded for the district court to consider whether Bradford established prejudice as to those two claims, and on the State of California's cross appeal, reversed the district court's grant of a conditional writ of habeas corpus as to Bradford's death sentence.

The panel held that California's timeliness rule for habeas petitions – pursuant to which the California Supreme Court denied as untimely Bradford's claims for prosecutorial misconduct for suppression of toxicology test results (Claim 4), prosecutorial misconduct for suppression of notes from witness interviews conducted by police (Claim 6), and ineffective assistance of counsel for failure to present a mental state defense of intoxication (Claim 8) – was adequate when Bradford filed his state habeas petition on January 6, 2000. In so holding, the panel rejected Bradford's contention that the adequacy of the timeliness rule should be analyzed as of June 3, 1996, the date upon which his claims fell outside the 90-day timeliness presumption. The panel wrote that this conclusion is not altered because Bradford did not file a state habeas petition until after filing his federal petition, and that, in order to obtain federal habeas review,

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Bradford must establish cause and prejudice to overcome his procedural default.

The panel held that Bradford established cause to excuse his default due to the confluence of several factors, including actions by his counsel that constituted abandonment. Applying *Apelt v. Ryan*, 878 F.3d 800 (9th Cir. 2017), the panel held that the California Supreme Court's conclusory denial of Bradford's claims on the merits does not preclude the district court from conducting the prejudice inquiry. The panel held that Bradford cannot establish prejudice for Claim 6 because the statements contained in the undisclosed interview notes were cumulative of evidence admitted at trial, such that the panel could not say that there is a reasonable probability that the trial result would have differed had the notes been disclosed. The panel remanded Claims 4 and 8 for the district court to conduct the prejudice inquiry in the first instance.

On the government's cross appeal from the district court's grant of a conditional writ as to the death sentence, the panel held that the California Supreme Court's conclusions regarding the voluntariness and admissibility of Bradford's four post-arrest statements were not contrary to, nor an unreasonable application of, federal law.

## COUNSEL

Patricia A. Young (argued), John L. Littrell, and Margo A. Rocconi, Deputy Public Defenders; Hilary Potashner, Federal Public Defender; Office of the Federal Public Defender, Los Angeles, California; for Petitioner-Appellant.

Xiomara Costello (argued), David E. Madeo, and A. Scott Hayward, Deputy Attorneys General; Steven D. Matthews and James William Bilderback II, Supervising Deputy Attorneys General; Lance E. Winters, Senior Assistant Attorney General; Gerald A. Engler, Chief Assistant Attorney General; Xavier Becerra, Attorney General; Office of the Attorney General, Los Angeles, California; for Respondent-Appellee.

## OPINION

M. SMITH, Circuit Judge:

Mark Alan Bradford was convicted of first-degree murder, first-degree robbery, rape, and sodomy in connection with the 1988 killing of Lynea Kokes. After a jury found that he killed Kokes to prevent her from testifying against him—a special circumstance permitting capital punishment—Bradford received a death sentence. Bradford filed a petition for a writ of habeas corpus in the district court, which denied relief as to the conviction but conditionally granted relief as to his death sentence absent a new special circumstance trial. He appeals the district court's limited grant of habeas relief, and the State of California cross appeals the grant of habeas relief. Bradford also claims that the district court erred in finding some of his claims procedurally barred.

Because we find that the California Supreme Court did not unreasonably apply clearly established federal law and that its holdings were not contrary to federal law, we vacate the district court's grant of habeas relief. But we also hold that Bradford has shown cause to overcome the procedural default of his claims for ineffective assistance of counsel and prosecutorial misconduct for the suppression of his toxicology test results, and remand for the district court to consider whether Bradford has established prejudice as to either claim. Finally, we decline to expand the certificate of appealability to include Bradford's uncertified claims.

## BACKGROUND

### I.  Factual Background

#### A.  Murder of Lynea Kokes

On the morning of April 18, 1988, Mark Bradford and his then-roommate Randall Beerman began playing cards and drinking alcohol in their apartment at Panorama City Lodge (the Lodge) in California. Bradford consumed a quart-and-a-half of Black Velvet Whiskey and a six-pack of beer. Around 3:30 pm, the Lodge's assistant manager, Joseph Stevens, spoke to Bradford. Stevens told Bradford to vacate his apartment because his rent was overdue; he also accused him of breaking into the Lodge's office.

That afternoon, Bradford helped Lynea Kokes (Kokes), a new manager for the Lodge, move into her apartment. Sometime after 5 p.m., Bradford called an ex-girlfriend, who said that he could stay with her in Fresno, California. Bradford told Beerman around 6 p.m. that he had been accused of breaking into the Lodge's office and had to leave.

At some point, Bradford vomited in the apartment bathroom and cleaned it up with towels. While Bradford cleaned the towels in the laundry room, Beerman saw a knife handle on the bathroom floor. That evening, Beerman went to the laundry room to put the towels in the dryer and saw a bent knife blade.

Sometime after 8 p.m., Alexander Kokes entered his apartment and found his wife's body. Police and paramedics called to the complex pronounced Kokes dead. Beerman later spoke with detectives and showed them the knife blade in the laundry room. He then let police into his apartment, where they arrested Bradford. The police searched Bradford and found a wooden knife handle, caked with a dried red liquid. Detectives also found a suitcase containing Kokes's wallet and other items, and a duffel bag containing red-stained clothing in Bradford's room. Shortly after his arrest, Bradford's blood was drawn for toxicology testing.

Forensic evidence indicated that Kokes died from a combination of strangulation and stab wounds. She had also been raped and sodomized. Bradford's fingerprint was found in Kokes's apartment, and the blood on Bradford's clothing tested positive for the presence of blood consistent with Kokes's.

### B. Bradford's Statements to the Police

Bradford was driven to the police station and made four statements over the course of the next day-and-a-half. The first statement, to Detectives Riehl and Arnold, was made at around 5 a.m. on April 19, 1988. Around 7 a.m., while being booked, Bradford made another statement to station officers. The third statement was made to Detective Hooks at 9:30 a.m. Just over twenty-four hours later, Bradford asked to speak with detectives, and made the fourth statement to

Detective Arnold.  In each of these statements, Bradford implicated himself in the murder of Kokes.

## II.  Procedural Background

### A.  State Trial

Bradford moved to suppress all four statements.  The trial court ruled that: (1) Bradford's first statement was obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), but was voluntary; (2) his second statement was voluntary and not the product of interrogation; (3) his third statement was involuntary; and (4) his fourth statement was self-initiated, voluntary, and not in violation of *Miranda.* Thus, the trial court concluded that the second and fourth statements were admissible, but the first and third statements were not.

Bradford's second statement was introduced at trial through the testimony of station officer Synthia Gordon. The audio tape of the fourth statement played in court, and jurors received a transcript of the statement.  Bradford's defense waived opening statement and presented no witnesses.

The jury found Bradford guilty of first-degree murder, first-degree robbery, rape, and sodomy.  The jury also found true the special circumstance that Bradford intentionally killed Kokes to prevent her testimony in a criminal proceeding.  However, the jury found Bradford not guilty of burglary, and found not true the special circumstances of rape-murder, sodomy-murder, and burglary-murder.

At the penalty phase, Bradford presented the testimony of several family friends, evidence that he was drunk on the day of the murder, and expert testimony that he had a

condition that makes him unable to control his conduct when he ingests even a small amount of alcohol.  The prosecution, in rebuttal, presented an expert who disputed the diagnosis of the condition.  At the conclusion of the penalty phase, Bradford was sentenced to death.

## B.  Direct Appeal

The California Supreme Court appointed Jonathan Milberg to represent Bradford on appeal and in state habeas proceedings.  On January 23, 1997, the California Supreme Court affirmed both Bradford's conviction and death sentence.  *People v. Bradford*, 929 P.2d 544 (1997) (*Bradford*).

The court agreed with the trial court that all four of Bradford's statements were voluntary, but that the first and third statements were inadmissible.  The California Supreme Court also determined that although the second portion of the second statement should not have been admitted because it violated *Miranda*, any error was harmless because the entire fourth statement was properly admitted.  The Supreme Court of the United States denied Bradford's petition for a writ of certiorari on November 3, 1997.  *Bradford v. California*, 522 U.S. 953 (1997).

## C.  Initial State and Federal Habeas Proceedings

Milberg repeatedly requested extensions of time and additional funds to prepare Bradford's state habeas petition, but he never filed the petition.

On September 15, 1997, the district court appointed the Federal Public Defender (FPD) to represent Bradford in federal habeas proceedings.  Bradford filed his first federal habeas petition on October 30, 1998.  On August 22, 2000,

the district court stayed the case to permit Bradford to withdraw his unexhausted claims and present them in state court.

Prior to the grant of the stay, the FPD filed Bradford's initial state habeas petition on January 6, 2000, along with a request to replace Milberg as state habeas counsel. Soon after, Milberg moved to withdraw as counsel; the California Supreme Court granted the motion and appointed the FPD. The California Supreme Court summarily denied Bradford's initial state habeas petition on August 29, 2001, rejecting all claims on the merits and some on procedural grounds. Pertinent to this appeal, the court denied Bradford's Claims 4 (prosecutorial misconduct for suppression of toxicology test results), 6 (prosecutorial misconduct for suppression of witness interview notes), and 8 (ineffective assistance of counsel for failure to present a mental state defense of intoxication) as untimely.[1]

### D.  Subsequent Federal Habeas Proceedings

On November 29, 2001, Bradford filed an amended habeas petition in the district court. Eventually, Bradford moved for summary adjudication on Claim 1, his *Miranda* claim. The court held that the California Supreme Court's decision was contrary to and based on an unreasonable application of clearly established federal law, that all of Bradford's statements were involuntary, and that the admission of the second and fourth statements was not harmless. The district court granted partial summary

---

[1] Bradford filed a second state habeas petition in September 2003, which was denied in August 2007. None of the claims in that petition is at issue here.

judgment in favor of Bradford, declining to overturn his conviction but vacating the death sentence.

The district court subsequently denied Bradford's remaining claims. The court held that Claims 4, 6, and 8 were procedurally barred as untimely presented in the state courts and that Claim 12—the cumulative error claim—was meritless.

The district court entered judgment on December 4, 2015, granting relief only on Claim 1, vacating the death sentence. The court issued a certificate of appealability (COA) on Claims 2–11 but denied Bradford's application to expand the COA to include Claim 12 and the denial of relief on the conviction under Claim 1.

Bradford raises on appeal only three of the certified claims—Claims 4, 6, and 8—and requests that we expand the COA for Claims 1 and 12. The State cross appeals the district court's grant of habeas relief on Claim 1.

## JURISDICTION AND STANDARD OF REVIEW

Because Bradford filed his petition for habeas corpus after the effective date of the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), we have jurisdiction over the certified claims and the State's cross appeal pursuant to 28 U.S.C. §§ 2253 and 2254.

We review the district court's denial of a habeas claim on state procedural grounds de novo. *Fields v. Calderon*, 125 F.3d 757, 759–60 (9th Cir. 1997). We also review de novo the grant of habeas relief. *Hartman v. Summers*, 120 F.3d 157, 160 (9th Cir. 1997).

A habeas petitioner challenging a state court decision in federal court must show that the last reasoned state court decision was either (1) "contrary to, or involved an unreasonable application of, clearly established Federal law," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "Clearly established federal law" "refers to the holdings, as opposed to the dicta" of Supreme Court decisions as of the time of the state court decision. *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003).

A state court unreasonably applies clearly established law if it "correctly identifies the governing legal rule but applies that rule unreasonably to the facts." *White v. Woodall*, 572 U.S. 415, 426 (2014). Relief under § 2254(d)(1) is available "if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." *Id.* at 427 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).

Alternatively, habeas relief is available if the last reasoned state court decision is contrary to clearly established federal law. A decision is contrary to clearly established precedent "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." *Williams v. Taylor*, 529 U.S. 362, 405 (2000). Also, when a state court "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite," the decision is contrary to Supreme Court precedent. *Id.*

## ANALYSIS

We consider first whether Bradford must, and can, overcome procedural default for Claims 4, 6, and 8. We then

analyze the State's cross appeal of the grant of habeas relief as to Claim 1.  Finally, we consider whether to expand the COA to include Bradford's uncertified claims.

## I.  Procedural Default of Claims 4, 6, and 8

The California Supreme Court denied as untimely Bradford's claims for prosecutorial misconduct for suppression of toxicology test results (Claim 4), prosecutorial misconduct for suppression of witness interview notes (Claim 6), and ineffective assistance of counsel for failure to present a mental state defense of intoxication (Claim 8).

Federal habeas review is unavailable "if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment."  *Walker v. Martin*, 562 U.S. 307, 315 (2011) (alteration in original).  To qualify as an adequate procedural ground, a state rule must be "firmly established and regularly followed."  *Id.* at 316.

Although a state court's denial that rests on an adequate and independent state-law ground generally precludes federal habeas relief, the Supreme Court has carved out an exception to that rule.  In *Coleman v. Thompson*, the Court held that where the petitioner could "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice," federal habeas review will not be barred. 501 U.S. 722, 750 (1991).

The district court concluded that habeas review of Claims 4, 6, and 8 was unavailable because California's timeliness rule was an adequate and independent state-law

ground, and that Bradford failed to establish cause to overcome procedural default.[2]

## A.  California's Timeliness Rule

To preclude federal habeas review, a state-law ground must be adequate—that is, it must be "firmly established and regularly followed." *Walker*, 562 U.S. at 316.  In *Walker*, the Supreme Court reversed our court and held that California's timeliness rule for habeas petitions, although discretionary, met the firmly established criteria. *Id.* at 321–22.  The Court noted that the California Supreme Court "framed the timeliness requirement for habeas petitioners in a trilogy of cases." *Id.* at 317 (citing *In re Robbins*, 959 P.2d 311 (Cal. 1998); *In re Gallego*, 959 P.2d 290 (Cal. 1998); and *In re Clark*, 855 P.2d 729 (Cal. 1993)).

In the first of these cases, *In re Clark*, the California Supreme Court explained the four-part framework that constitutes California's timeliness rule for habeas petitions. The court acknowledged that its June 1989 publication of timeliness standards for capital case petitions established a presumption of timeliness for habeas petitions filed "within 90 days of the final due date for the filing of an appellant's reply brief." 855 P.2d at 751.[3]  A petitioner could also show

---

[2] The district court found that Bradford could not establish cause because he failed to comply with *California's* timeliness requirements, and because the FPD's delay in filing his state petition was unjustified. The question of cause, however, is "a question of *federal* law," *Murray v. Carrier*, 477 U.S. 478, 489 (1986) (emphasis added), and, as a result, the district court erred in analyzing whether Bradford met the justification requirements pursuant to California law.

[3] California's timeliness rule has since been amended to increase the window of presumptive timeliness to 180 days. *See In re Reno*, 283 P.3d

that a presumptively untimely petition was filed without substantial delay, that good cause justified a substantial delay, or that the petition fits within several enumerated exceptions. *See id.* at 751–61.

Bradford contends that the adequacy of the California timeliness rule should be analyzed as of June 3, 1996, the date upon which his claims fell outside the 90-day timeliness presumption, and that pursuant to *Walker*, the California timeliness rule was not adequate until 1998. The State claims that Bradford's default should be considered as of January 6, 2000—when Bradford filed his state habeas petition.

Where, as here, there are no issues concerning whether the defendant had adequate notice of the timeliness rule, the correct date is when the state habeas petition is filed. In *Clark*, the California Supreme Court considered whether the petitioner had established substantial delay at the *time of filing*, where his first petition was filed almost two years after the policies establishing the 90-day presumption window were issued, and his second petition was filed five months after the first one was filed. 855 P.2d at 750–51.

Our cases follow suit. In *Morales v. Calderon*, the petitioner filed his first federal habeas petition on July 20, 1992; his first state habeas petition on December 16, 1992 (about three and a half years after the California Supreme Court confirmed his convictions); and a supplemental state petition later. 85 F.3d 1387, 1388 (9th Cir. 1996). The California Supreme Court denied both of his state habeas petitions on July 28, 1993. *Id.* We held that California's

_____

1181, 1208 (Cal. 2012) (citing Cal. Supreme Ct. Policies, policy 3, std. 1–1.1.).

timeliness rule was not adequate at "any time after Morales's convictions were affirmed and *before he filed his first state habeas petition*." *Id.* at 1393 (emphasis added). Similarly, in *Calderon v. U.S. Dist. Court*, we found supported the district court's conclusion that the adequacy of the state procedural rule was to be analyzed at the time the petitioner filed his first state habeas petition in 1987. 103 F.3d 72, 75 (9th Cir. 1996). The court did not consider the petitioner's default as of 1989, when the California Supreme Court denied his petition; in 1994 when he filed a second state petition; or in 1995, when the second petition was denied. *Id.*

Bradford filed his initial state habeas petition on January 6, 2000. By then, the California Supreme Court had decided *Clark*, *Robbins*, and *Gallego*.[4] Indeed, Bradford concedes that California's timeliness rule was adequate as of 1998.

Accordingly, we hold that California's timeliness rule was adequate as of January 6, 2000, when Bradford filed his state habeas petition. Our conclusion is not altered because Bradford did not file a state habeas petition prior to filing his federal petition. In *Morales*, the petitioner also did not file a state habeas petition until after filing his petition in federal

---

[4] We have recognized several times that pre-*Clark* the California timeliness rule was not firmly established and therefore could not serve as an independent and adequate state ground to support procedural default. *See, e.g.*, *Calderon v. U.S. Dist. Court*, 96 F.3d 1126, 1130 (9th Cir. 1996) (holding that California's timeliness requirements were not consistently applied before *Clark*); *Morales*, 85 F.3d at 1391 (finding "no discernible clear rule" for petitions filed outside the 90-day presumption of timeliness window before *Clark*). We have not yet expressed any opinion as to whether *Clark* sufficiently clarified the timeliness rule such that it was firmly established from then on. It is unnecessary to decide the question in this case.

court, but we still looked to the filing date of his first state habeas petition. 85 F.3d at 1388. Bradford relies on our decision in *Calderon v. U.S. Dist. Court*, 96 F.3d 1126 (9th Cir. 1996), but it is inapposite. There, the petitioner filed his federal habeas petition in 1991 and his first state petition on May 27, 1994. *Id.* at 1128. Despite the petitioner filing his state habeas petition in 1994, the parties appeared to agree that any default "would have occurred before *Clark* was decided," and we therefore held that the timeliness rule did not bar federal review. *Id.* at 1130–31. Here, the State has not conceded that Bradford's default occurred pre-*Clark*, nor does Bradford advance this position.

Since Bradford does not argue that a failure to consider his claims will result in a fundamental miscarriage of justice, Bradford must establish cause and prejudice to overcome his procedural default. *See Coleman*, 501 U.S. at 750. We address that issue next.

## B.  Cause to Overcome Procedural Default

Cause "must be something *external* to the petitioner." *Id.* at 753. External factors include obstacles such as "a showing that the factual or legal basis for a claim was not reasonably available to counsel," or that "interference by officials . . . made compliance impracticable." *Murray v. Carrier*, 477 U.S. 478, 488 (1986) (internal citations omitted).

"Attorney ignorance or inadvertence" is not cause. *Coleman*, 501 U.S. at 753. But, "[a]ttorney error that constitutes ineffective assistance of counsel is cause." *Id.* at 753–54. This is because when an attorney's error constitutes a violation of the prisoner's right to counsel, the

error is "imputed to the State," and is therefore an external factor. *Id.* at 754.[5]

*Murray* left open "whether counsel's decision not to take an appeal at all" might require a different standard. 477 U.S. at 492. *Coleman* answered that question in the negative and held that the same cause and prejudice standard applied to a "failure to appeal at all." 501 U.S. at 750. Later, *Maples v. Thomas* clarified that when a default results from an attorney abandoning his client without notice, the attorney's "acts or omissions [] 'cannot fairly be attributed to [the client].'" 565 U.S. 266, 281 (2012) (second alteration in original) (quoting *Coleman*, 501 U.S. at 753). In *Maples*, the petitioner's attorneys ceased their representation long before Maples's appeal was due, but because they had not formally withdrawn, Maples did not receive any notice before his time to appeal expired. *Id.* at 287–88. The Court held that Maples had established cause to excuse his procedural default due to his attorneys' abandonment. *Id.* at 289.

Bradford contends that Milberg's failure to file his state habeas petition constitutes cause to excuse his default. Bradford also points to the California Supreme Court's response to his request for an extension to file that there was no "due date" for his state habeas petition as contributing to the cause for default. The State argues that even if Bradford could show cause until 1998—when the FPD filed his

---

[5] By contrast, if a petitioner had no constitutional right to counsel, he "must bear the burden of a failure to follow state procedural rules." *Id.* Thus, in *Coleman*, because the defendant had no right to counsel during his state post-conviction proceedings, the Court held that any attorney error that led to the default of his claims could not constitute cause. *Id.* at 757.

federal petition—there is no justification for the FPD's 15-month delay in filing the state petition.

We find that Bradford has established cause due to the confluence of several factors. First, despite Milberg's filing of multiple requests for extensions of time to file Bradford's habeas petition and requesting preparation funds, he *never* filed a petition. Nor did Milberg withdraw so that Bradford could obtain other counsel. Milberg's actions clearly constituted abandonment.

Second, the California Supreme Court did not grant Bradford an extension to file his petition, informing him instead this petition was not subject to a "due date." While that statement is technically true because California does not employ a strict deadline, a petitioner must make a greater showing to justify the delay once outside the presumptively timely window, which an extension could have broadened. *See Clark*, 855 P.2d at 752–53.

Third, the district court did not rule for over a year on Bradford's motion to stay his case in order to exhaust his claims in state court. By the time the FPD filed Bradford's state petition on January 6, 2000, the district court still had not decided the merits of his motion or identified which of his claims were unexhausted.

And fourth, Milberg did not move to withdraw as Bradford's state habeas counsel until soon after the FPD filed his state habeas petition. Only then did the California Supreme Court grant Milberg's motion and appoint the FPD as Bradford's state habeas counsel.

Based on these unique circumstances that caused the delay in the filing of the state habeas petition, we find that

Bradford has satisfied the cause prong of the cause and prejudice inquiry.

## C. Prejudice to Overcome Procedural Default

To overcome procedural default, a petitioner must also show "actual prejudice." *Coleman*, 501 U.S. at 750. This requires the petitioner to establish "not merely that the errors at . . . trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Murray*, 477 U.S. at 494 (alteration in original).

The district court, having found that Bradford had not established cause, never reached the question of prejudice. On appeal, the State argues only that Bradford cannot demonstrate prejudice because the California Supreme Court considered each of his claims and denied them on the merits in *Bradford*.

Our opinion in *Apelt v. Ryan*, 878 F.3d 800 (9th Cir. 2017), undermines the State's argument. There, we considered the effect on the cause and prejudice analysis of a state court decision that both held that a claim was procedurally barred and denied the claim on the merits. *Id.* at 825. The state argued that because the state court had denied a post-conviction relief (PCR) petition on the merits, the petitioner could not show that the failure to raise these claims was prejudicial. We rejected that argument and found that the state court's "determination [was] not in itself a complete bar to federal habeas review—particularly where, as here, the state court's merits ruling on the PCR is a conclusory alternate ruling." *Id.* at 827.

The California Supreme Court's decision on the merits of Bradford's claims was similarly conclusory, and the

underlying principle of *Apelt* applies.    As *Apelt* demonstrated, a federal court first considers whether the petitioner meets the cause and prejudice standard to overcome procedural default, and then undertakes deferential review of the state court's merits determination of the claim.    *See id.* at 828–34 (finding ineffective petitioner's trial counsel and sentencing counsel but concluding that the state court's decision to the contrary regarding his trial counsel was not unreasonable).**[6]** Similarly here, the district court is not precluded from conducting the prejudice inquiry because the California Supreme Court denied Bradford's claims on the merits.

We find, however, that Bradford cannot establish prejudice for Claim 6—that the prosecution suppressed various notes from witness interviews conducted by the police.   Under *Brady v. Maryland*, the prosecution must disclose exculpatory evidence to the defense.   373 U.S. 83, 87 (1963).   To succeed on his *Brady* claim, Bradford must prove that (1) the evidence is favorable to him, (2) the state suppressed the evidence, and (3) prejudice ensued.   *See Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).   The third component of the *Brady* claim overlaps with the prejudice inquiry here, because "unless [the] documents were

---

**[6]** We emphasize that a state court's merits denial should not preclude the prejudice inquiry to overcome procedural default.  Although they rely on similar analyses, the two inquiries are, and must remain, separate.  For example, a federal court could determine that a petitioner meets the *Coleman* standard and establishes cause and prejudice to overcome default.   Then, pursuant to federal habeas review, the court could conclude that the state court's decision was objectively unreasonable and grant habeas relief.   In such a situation, to hold at the outset that the state court's merits denial of the claim barred the prejudice inquiry for procedural default would improperly shield the claim from federal review.

'material' for *Brady* purposes, their suppression did not give rise to sufficient prejudice to overcome the procedural default." *Id.* at 282. That is, there must be a "'reasonable probability' that the result of the trial would have been different if the suppressed documents had been disclosed to the defense." *Id.* at 289.

Bradford focuses on statements given to the police by Freddie Maldonado, Jack Schwark, and Phil Hall—none of which was provided to the defense in discovery. In their interviews, Maldonado stated that Bradford was "real drunk" as he helped Kokes move into her apartment; Schwark noted that Bradford's eyes were "red and glassy" and he smelled of alcohol around 4:30 p.m. to 5 p.m.; and Hall said that Bradford had a "weird look" in his eyes. These observations might have assisted the defense in mounting a mental state defense to negate the intent element of first-degree murder and helped to impeach Hall, who testified at trial that Bradford did not appear to be under the influence of anything on the day of the offenses. *See People v. Saille*, 820 P.2d 588, 595 (Cal. 1991) (noting voluntary intoxication and mental illness evidence are admissible on the issue of whether the accused "actually formed a required specific intent, premeditated, deliberated . . . when a specific intent crime is charged").

But, Beerman's testimony that Bradford was drunk, and evidence of the amount of alcohol that Bradford had consumed, were introduced at trial. The statements from these three other individuals in the apartment complex who saw Bradford looking "drunk" or "weird" were thus cumulative. We cannot say that there is a "reasonable probability" the trial result would have differed had the interview notes been disclosed. *Strickler*, 527 U.S. at 289.

While we remand Claims 4 and 8, and not Claim 6, for the district court to conduct the prejudice inquiry in the first instance, our decision to remand these two claims should not be regarded as suggestive of their merits.

## II. Voluntariness of Bradford's Post-Arrest Statements

Over the course of about a day-and-a-half, after being arrested, Bradford made four statements to the police on April 19 and 20, 1988.  During each, Bradford implicated himself in the murder of Kokes by describing details of the crime.[7]

On direct appeal, Bradford challenged the admission of his second and fourth statements.  The California Supreme Court held that although the second part of the second statement had erroneously been admitted at trial as substantive evidence, its admission constituted harmless error because the fourth statement had been properly admitted.  *Bradford*, 929 P.2d at 564.

The district court, after conducting de novo review, held that all of Bradford's statements were involuntary, that the California Supreme Court's decision denying relief was contrary to and based on an unreasonable application of clearly established federal law, and that the admission of the entire second and fourth statements was not harmless.  The district court granted habeas relief as to the special

---

[7] The State requests that we take judicial notice of the audio-recordings of Bradford's first, third, and fourth statements to the police. The California courts considered the recorded interviews in determining the voluntariness of Bradford's confessions.  *Bradford*, 929 P.2d at 567. Because the request is unopposed, we **GRANT** the request and take judicial notice.

circumstance and penalty phase and vacated Bradford's death sentence. The State cross appeals from that decision.

Under *Miranda*, custodial interrogation of a defendant must be preceded by the advice that he has the rights, among others, to remain silent and to have an attorney present. If a defendant requests counsel, "the interrogation must cease until an attorney is present." 384 U.S. at 474. If a defendant invokes his right to counsel, a subsequent waiver must be voluntary, knowing, and intelligent. *Edwards v. Arizona*, 451 U.S. 477, 482 (1981). It is insufficient to show "only that [the defendant] responded to further police-initiated custodial interrogation" to establish a waiver of counsel. *Id.* at 484. Once a defendant requests counsel, he should not be subject to further interrogation "until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id.* at 484–85. Thus, *Edwards* established a "prophylactic rule designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights." *Michigan v. Harvey*, 494 U.S. 344, 350 (1990).

Statements obtained in violation of *Miranda* are nonetheless admissible for impeachment if their "trustworthiness . . . satisfies legal standards." *Mincey v. Arizona*, 437 U.S. 385, 397–98 (1978) (alteration in original). But, "any" use of a defendant's involuntary statement is a denial of due process. *Id.* at 398. A voluntary statement must be "the product of a rational intellect and a free will." *Id.* This voluntariness inquiry considers "all the circumstances of the interrogation." *Id.* at 401. Relevant circumstances may include: a suspect's age, education, intelligence, physical health, and prior experience with the criminal system; the length, location, and conditions of

detention; the length and nature of questioning; and the use by law enforcement of any threats, punishments, or inducements. *See, e.g.*, *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). The state bears the burden of proving by a preponderance of the evidence that the defendant's *Miranda* waiver and confession were voluntary. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

A prior *coerced* confession can "taint" a subsequent one. *See Oregon v. Elstad*, 470 U.S. 298, 310 (1985). In conducting a taint analysis, the court considers "the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators." *Id.*

An *Edwards* violation, however, does not on its own render subsequent confessions involuntary. *See Elstad*, 470 U.S. 308–10. Contrary to Bradford's argument, the Supreme Court has not clearly established that a presumption of involuntariness attaches to statements taken in violation of *Edwards*, such that subsequent statements are tainted. The Court has held that statements taken in violation of *Edwards* may still be used for impeachment, *Oregon v. Hass*, 420 U.S. 714, 722–23; *see also Harvey*, 494 U.S. at 350–51, which means that such statements are not presumed to be involuntary by virtue of the *Edwards* violation alone. *See Hass*, 420 U.S. at 722–23; *Mincey*, 437 U.S. at 398.

Although the California Supreme Court held that Bradford's first and third statements were inadmissible, because the district court's analysis of these statements influenced its holding as to the second and fourth statements, we review all four. The California Supreme Court provided a detailed account of the four statements in *Bradford*, and we recite here only those facts necessary to provide context for our analysis. We hold that the California Supreme Court's

conclusions were not contrary to, nor were they an unreasonable application of, federal law.

### A. Statement 1: Statements to Detective Riehl on April 19, 1988

In the early morning of April 19, 1988, Detectives Riehl, Arnold, and Coblentz interviewed Bradford on tape in the Van Nuys police station. *Bradford*, 929 P.2d at 555. Soon after obtaining Bradford's background information, Detective Riehl informed Bradford of his *Miranda* rights and asked if he wanted to speak about "what happened last night." Bradford declined and requested a lawyer. Detective Riehl then told Bradford they could go "off the record." Bradford soon agreed to discuss Kokes's murder and described his actions.

The California Supreme Court held that although the police violated *Miranda* in obtaining Bradford's first statement, it was voluntary. *Id.* at 566. The court noted that Bradford had been in custody "only . . . six hours" when he made the statement. *Id.* Moreover, the court observed that once the detectives told him they were "off the record," he demonstrated "no hesitation" in speaking with them, and his voice exhibited no "stress" or "excitement." *Id.* at 566–67. The district court held that this conclusion was contrary to and an unreasonable application of federal law because the detectives continued to interrogate Bradford after he invoked his right to counsel and made misleading statements regarding potential defenses.

Under our required deferential review, we find that the California Supreme Court's totality of the circumstances analysis was not an unreasonable application of federal law. We find support for the court's conclusions regarding Bradford's voice upon our review of the interview recording,

which demonstrates that Bradford's tone remained steady and flat. The district court found damning the fact that Detective Riehl improperly suggested that Bradford would be "stuck" if he waited to speak to an attorney and spoke about potential mitigation defenses. But the California Supreme Court noted these facts, and the record here diverges significantly from others in which we have determined that police engaged in coercive tactics. *See, e.g.*, *Cooper v. Dupnik*, 963 F.2d 1220, 1243, 1248 (9th Cir. 1992) (describing involuntary statement where police ignored repeated requests for counsel and badgered suspect for four hours with "harsh and unrelenting" questioning until he was "sobbing and pleading his innocence"), *overruled on other grounds by Chavez v. Martinez*, 538 U.S. 760 (2003). Despite Bradford's unambiguous requests for a lawyer and the interrogation extending beyond one hour, the California Supreme Court's holding that his statement was voluntary, despite the *Edwards* violation, was not an unreasonable application of the federal voluntariness analysis.

In addition, the California Supreme Court's conclusion was not contrary to clearly established federal law. The California Supreme Court identified the relevant precedent of *Miranda*, *Edwards*, and their progeny. The court also correctly noted that an *Edwards* violation alone, without further coercion or other circumstances, does not inherently render the statement involuntary. *Bradford*, 929 P.2d at 566. Therefore, the district court erred holding that Bradford's first statement was involuntary.

## B.  Statement 2: Booking Statement on April 19, 1988

The second statement consists of two exchanges occurring on April 19, 1988 at approximately 7 a.m., while Van Nuys station officers booked Bradford. When Officer Denby fingerprinted Bradford, an unidentified detective

applying for a license told Bradford he looked "like a traffic ticket" and asked, "Is it just a warrant?" Bradford responded, "Murder." The detective then left, and for about two minutes neither Officer Gordon nor Officer Denby spoke to Bradford. Then, when Officer Denby finished the fingerprinting, Bradford—unprompted—told the officers that he had helped Kokes move into her apartment, choked her, left the apartment to clean up, and returned to kill her. Officer Gordon then asked Bradford if he felt sorry, and the officers proceeded to ask him several questions about the crime. Neither officer informed Bradford of his *Miranda* rights.

The reviewing courts divided the booking statement into two parts when analyzing its admissibility and voluntariness, and so do we. The first part consists of the remark from the unidentified detective until the end of the officers' silence. The second part is the exchange between the officers and Bradford during which the officers questioned him.

### i. First part of the booking statement

*Miranda* and *Edwards* apply only to custodial interrogation. *See Miranda*, 384 U.S. at 478–79; *Edwards*, 451 U.S. at 486 ("Absent such [custodial] interrogation, there would have been no infringement of the right that Edwards invoked."); *see also Arizona v. Roberson*, 486 U.S. 675, 681 (1988) (observing that the "prophylactic protections" of *Miranda* "are implemented by the application of the *Edwards* corollary"). Custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444. Yet not all statements given by a person in custody are entitled to *Miranda* protection. Rather, interrogation "must reflect a measure of

compulsion above and beyond that inherent in custody itself." *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980). As refined by *Innis*, police officers' express questioning or its functional equivalent—when they "*should have known* [their words or actions] were reasonably likely to elicit an incriminating response," *Id.* at 302—constitute interrogation.

In *Innis*, the defendant requested counsel after being advised of his *Miranda* rights. *Id.* at 294. As he sat in a patrol car en route to the station, the officers conversed about a missing shotgun and their concern that nearby handicapped children would find the gun and hurt themselves. *Id.* at 294–95. The defendant "interrupted the conversation" and told the officers to go back so that he could show them the gun's location. *Id.* at 295. The Court held that this exchange was not an interrogation within the meaning of *Miranda*, because it could not determine that the officers should have known their "off hand remarks" were reasonably likely to elicit an incriminating response. *Id.* at 303.

The California Supreme Court found that the first part of Bradford's second statement was admissible because the detective's statement was not an interrogation and so Bradford's response of "Murder" was not protected, and that Bradford had voluntarily initiated a discussion about the murder before the officers questioned him. *Bradford*, 929 P.2d at 562. The district court found involuntary this portion of Bradford's booking statement because it was the direct result of the prior coercion and a "mere[] 45 minutes after Bradford's earlier coerced statement to Riehl."

The California Supreme Court applied *Innis* and determined that because neither the detective's "casual statement" nor his question was reasonably likely to elicit an incriminating response, there had been no interrogation. *Id.*

That conclusion is not contrary to or an unreasonable application of federal law. The detective directly questioned Bradford, but there was no "measure of compulsion above and beyond that inherent in custody itself" such that the question transformed into an interrogation and Bradford's answer into "the product of interrogation." *Innis*, 446 U.S. at 299–300. Similarly, Bradford's discussion of the murder after the detective left was not the product of custodial interrogation. Bradford's volunteered statements were unprompted by the officers. *See Edwards*, 451 U.S. at 485–86 (noting that the police could have used incriminating statements made by Edwards prior to his access to counsel if they were "voluntary, volunteered statements").

### ii.  Second part of the booking statement

The officers elicited the second part of the booking statement during custodial interrogation, and the California Supreme Court concluded that under the totality of the circumstances, while Bradford had not knowingly and intelligently waived his right to counsel, his statements were voluntary. *Bradford*, 929 P.2d at 562–64. The California Supreme Court held that any error in admission of this statement was harmless "beyond a reasonable doubt," finding it duplicative of Bradford's fourth statement and the evidence of his guilt "overwhelming." *Bradford*, 929 P.2d at 564. Conversely, the district court held that the admission of this portion of the booking statement did not constitute harmless error because neither the fourth nor second statements were voluntary.

Because we agree with the California Supreme Court that Bradford's first statement and the first part of the booking statement were voluntary, there was no coercive "taint" to stretch to the second part of the booking statement to render it involuntary. *See Elstad*, 427 U.S. at 310.

Further, Bradford initiated this conversation with the officers after saying "Murder," and there is no evidence of coercion or compulsion in that short exchange. *See Cooper*, 963 F.2d at 1248 (describing "hours of mistreatment and what can fairly be described as sophisticated psychological torture"). The California Supreme Court's conclusion that this part of the second statement was voluntary was not unreasonable or contrary to federal law.

This part of the booking statement, though, was introduced as substantive evidence at trial, despite the officers' failure to advise Bradford of his *Miranda* rights and the absence of a waiver by Bradford of these rights. On direct appeal, a constitutional trial error can be held excused only if "it was harmless beyond a reasonable doubt." *Brecht v. Abrahamson*, 507 U.S. 619, 630 (1993). On habeas review, by contrast, we must apply the "less onerous standard" of whether the constitutional error "had substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 637 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). "[T]he *Brecht* standard 'subsumes' the [§ 2254(d) requirements] when a federal habeas petitioner contests a state court's determination that a constitutional error was harmless." *Davis v. Ayala*, 135 S. Ct. 2187, 2198 (2015) (quoting *Fry v. Pliler*, 551 U.S. 112, 120 (2007)).

Given the amount of detail Bradford offered in the fourth statement, the second part of the booking statement was plainly cumulative. As discussed below, we find that the California Supreme Court did not unreasonably apply federal law in determining that the fourth statement was admissible. Thus, the admission of this portion of the booking statement did not have a "substantial and injurious effect" on the jury. *Cooper v. Taylor*, 103 F.3d 366, 370–71

(4th Cir. 1996) (en banc) (finding harmless the improper admission of defendant's third confession given that the same and additional information was provided in two earlier, admissible confessions).

## C. Statement 3: Statements to Detective Hooks on April 19, 1988

Bradford's third statement occurred on April 19, 1988 beginning around 9:30 a.m. *Bradford*, 929 P.2d at 557. Detective Hooks interviewed Bradford, and began by noting that "it's my understanding that you chose not to waive your rights at this time, is that correct?" After a clarification, Bradford answered that he wanted an attorney "to help me out a little bit." Despite this affirmation of Bradford's request for counsel, Detective Hooks proceeded to interrogate him "off the record." Bradford again described Kokes's murder and the aftermath.

The California Supreme Court, although correctly noting that Detective Hooks's conduct was "unethical and . . . strongly disapproved," found the third statement voluntary because Bradford had been in custody approximately eleven hours and had demonstrated no hesitation in speaking with Detective Hooks. *Bradford*, 929 P.2d at 566–67. The district court determined that Bradford's third statement was involuntary.

While the California Supreme Court's observation that Detective Hooks's conduct was "unethical" seemingly flies in the face of its conclusion that his tactics were not impermissibly coercive, the court's totality of the circumstances conclusion is entitled to deference. Contrary to the district court's finding, this statement was not tainted by a prior involuntary statement. And, as with the other recorded interviews, Bradford betrayed no emotion in the

interview to signal his distress or discomfort. *Cf. Henry v. Kernan*, 197 F.3d 1021, 1027 (9th Cir. 1999) (describing incoherent suspect as "shaken, confused, and frightened, crying in parts and frequently asking for forgiveness" in interrogation after officers made misleading comments that nothing he said could be used against him). It was not objectively unreasonable for the California Supreme Court to determine that Bradford's will was not overborne during the interrogation. *Cf. Mincey*, 437 U.S. at 401–02 ("Mincey was weakened by pain and shock, isolated from family, friends, and legal counsel, and barely conscious, and his will was simply overborne.").

### D. Statement 4: Statements to Detective Arnold on April 20, 1988

Bradford's fourth challenged statement occurred on the morning of April 20, 1988. Bradford called Detective Hooks and said that he wanted to put a statement on the record. *Bradford*, 929 P.2d at 559. At approximately 10 a.m., Bradford met with Detective Arnold for the interrogation. *Id.*

At the beginning, Detective Arnold asked why Bradford wanted to speak to them, and Bradford responded, "I had some questions and I'll probably talk, I don't know." After some back and forth, Detective Arnold said that if Bradford wanted to give an "on the record statement," he would "readvise [him] of [his] constitutional rights." Detective Arnold then advised Bradford of his right to an attorney. Next, Detective Arnold asked if Bradford understood that he had the right to counsel, and Bradford affirmed that he did. Subsequently, Detective Arnold queried whether Bradford wanted to give up his right to an attorney, and Bradford affirmed. Detective Arnold then accurately stated Bradford's *Miranda* rights, and asked if he wanted to "give

up your right to remain silent." Bradford again stated, "Yes." Detective Arnold asked, "Yes?" thrice more, and Bradford affirmed twice. Finally, Detective Arnold repeated, "Ok – do you wish to give up your right to have an attorney present during questioning." Bradford responded, "Yes."

During the interview, Bradford described helping Kokes move in, grabbing her throat and raping her, and hitting her as she gasped for air. Bradford stated that he returned to his room to shower because he "had blood all over me." In his room, he started thinking about "[i]f she was gonn [sic] live, you know, and ratting me off." Armed with a knife, Bradford returned to Kokes's apartment where he thought she was still alive because she was "gasping for air." He then "rolled her over and slit her throat" twice. He also stabbed her in the chest.

The California Supreme Court held that Bradford's statement to Detective Arnold was properly admitted because it was voluntary and Bradford validly waived his *Miranda* rights. *Bradford*, 929 P.2d at 569. The district court found the voluntariness ruling contrary to and an unreasonable application of federal law due to the lasting taint of the three prior illegally-elicited statements.

The Supreme Court has been clear that a defendant who has asserted his right to counsel may still subsequently waive his *Miranda* rights. *See Minnick v. Mississippi*, 498 U.S. 146, 156 (1990) ("*Edwards* does not foreclose finding a waiver of Fifth Amendment protections after counsel has been requested, provided the accused has initiated the conversation or discussions with the authorities."); *Edwards*, 451 U.S. at 485 (noting an accused cannot be further interrogated unless "the accused himself initiates further communication . . . with the police"). Here, Bradford

initiated the interrogation by calling Detective Hooks and requesting a meeting. This self-initiated interrogation is clearly permissible under *Edwards*. The California Supreme Court properly identified the next inquiry as whether Bradford's waiver of his right to counsel was knowing and intelligent and found that it was. *Bradford*, 929 P.2d at 568–69.

Because it reasonably concluded that Bradford's prior three statements were voluntary, the California Supreme Court need not have considered whether any taint passed to this fourth statement. Although the three separate *Miranda/Edwards* violations may weigh against a finding of voluntariness, no Supreme Court precedent directed the California Supreme Court to find a subsequent involuntary statement after three voluntary ones, albeit ones given in violation of *Miranda/Edwards*. The California Supreme Court also considered whether the previous interrogations had "amounted to psychological coercion" to break down Bradford's resistance, and reasonably found that "no coercive threats or promises" were made. *Id.* at 569.[8]

Accordingly, the California Supreme Court's holding that Bradford's fourth statement was voluntary was not objectively unreasonable. Bradford initiated the fourth interrogation more than twenty-four hours after the third

---

[8] Bradford relies heavily on our pre-AEDPA case *Collazo v. Estelle*, in which we held on de novo review that a police officer's psychologically coercive tactics rendered a defendant's later Mirandized confession involuntary where the officer threatened that it could be worse for the defendant if he spoke to a lawyer, and continued interrogation after the defendant requested counsel. 940 F.2d 411, 419–20 (9th Cir. 1991) (en banc). While some similarities exist between Bradford's case and *Collazo*, our cases cannot serve as clearly established law for the purposes of habeas review post-AEDPA.

one, and Detective Arnold's numerous clarifications of Bradford's *Miranda* rights and Bradford's several affirmations of his waiver rendered the waiver knowing and intelligent. Starkly absent from the record are coercive tactics that could lead us to conclude that Bradford's fourth statement was involuntary or his waiver unknowing or unintelligent.

### E. Conclusion

None of the California Supreme Court's conclusions regarding the voluntariness and admissibility of Bradford's four post-arrest statements deserves to be disturbed on federal habeas review. Accordingly, we reverse the district court's holding for Claim 1 and its grant of a conditional writ based on its finding that the California Supreme Court's decision was contrary to or an unreasonable application of clearly established federal law.

### III.     Expansion of the Certificate of Appealability

A "COA may not issue unless 'the applicant has made a substantial showing of the denial of a constitutional right' . . . a demonstration that . . . includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 483–84 (2000) (internal citations omitted).

We decline to issue a COA with respect to Bradford's claims that the district court erred in fashioning a limited habeas remedy or not granting him a new trial, in light of our conclusion above that the district court erred in granting habeas relief on Bradford's Claim 1. Because we remand

Claims 4 and 8 to the district court to address the issue of prejudice, we decline to expand the COA at this time to address the issue of cumulative prejudice. And, because we conclude that Bradford was not prejudiced with respect to the subject matter of Claim 6, we need not expand the COA to consider cumulative prejudice arising from that claim.

## CONCLUSION

Due to the circumstances that delayed the filing of his state habeas petition, Bradford has established cause to overcome procedural default. We reverse the district court's procedural default holding as to Claims 4 and 8 and remand for the district court to conduct the prejudice prong analysis. We find, however, that Bradford cannot establish prejudice as to Claim 6 and affirm the denial of habeas relief on that claim. As to the State's cross appeal, we reverse the conditional writ of habeas corpus as to Bradford's death sentence. Finally, we decline to expand the COA.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**