**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

MARK ALAN BRADFORD,

*Petitioner-Appellee*,

v.

DAO VANG, Warden,

*Respondent-Appellant*.

No. 23-99005

D.C. No.
2:97-cv-06221-
TJH

OPINION

Appeal from the United States District Court
for the Central District of California
Terry J. Hatter, Jr., District Judge, Presiding

Argued and Submitted June 23, 2025
Seattle, Washington

Filed May 14, 2026

Before: Ronald M. Gould, Milan D. Smith, Jr., and Daniel
P. Collins, Circuit Judges.

Opinion by Judge Collins

# SUMMARY[*]

## Habeas Corpus / Death Penalty

The panel (1) reversed the district court's judgment granting habeas corpus relief to Mark Alan Bradford on his guilt-phase Claims 4 (*Brady*) and 8 (*Strickland*) and setting aside his California conviction for first-degree murder; and (2) remanded for the district court (a) to enter an order denying Bradford's habeas petition in its entirety insofar as it challenges (i) his judgment of conviction for first-degree murder, rape, and sodomy; (ii) the jury's special circumstance findings; and (iii) the judgment of conviction on the special circumstances; and (b) to resolve any remaining aspects of Bradford's penalty-phase claims.

The panel held that, as in *Lambrix v. Singletary*, 520 U.S. 518 (1997), it is appropriate to address the merits of Bradford's claims under the Antiterrorism and Effective Death Penalty Act (AEDPA) before considering (if necessary) the issue of whether, under *Coleman v. Thompson*, 501 U.S. 722 (1991), Bradford has shown prejudice sufficient to excuse his state-law procedural default. This is because both Claims 4 and 8 contain a prejudice component that overlaps with the *Coleman* inquiry, and the standard of review applicable to the prejudice component of the merits of those claims is more deferential than the standard that applies to the *Coleman* prejudice inquiry.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Before turning to the merits of Bradford's *Brady* and *Strickland* claims under AEDPA's deferential standards, the panel addressed another threshold issue—whether, as Bradford argued, the Supreme Court's recent decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), calls into question the prevailing judicial interpretations of 28 U.S.C. § 2254(d) and requires rejection of current precedent's highly deferential standard of review of state court merits decisions under AEDPA. The panel rejected this contention.

The panel therefore evaluated the California Supreme Court's summary denial of Claims 4 and 8 under AEDPA's deferential standards.

- Addressing the parties' dispute as to what facts this court must accept as true, the panel explained that it must consider how the California Supreme Court *may reasonably have construed* the adequacy of Bradford's allegations under California law. The panel concluded that the California Supreme Court could reasonably have concluded that Bradford failed to support his allegation—made on "information and belief"—that blood-alcohol-content testing of Bradford's blood had in fact been done.

- Bradford's *Brady* claim (Claim 4) rested exclusively on his contention that the State had suppressed the results of blood-alcohol-content testing that had actually been conducted on Bradford's blood sample. Because the California Supreme Court could reasonably have concluded that Bradford failed to provide sufficient factual support for his allegation that such blood-testing results existed, that

court could likewise have reasonably concluded that the sole factual predicate for Bradford's *Brady* claim was wholly vitiated. It necessarily follows that the California Supreme Court could reasonably have concluded that the Claim 4 failed on the merits.

- The California Supreme Court could also reasonably have concluded that Bradford's relevant ineffective assistance claim (Claim 8(B)) fails to the extent that it rested on defense counsel's asserted failure to request blood-testing results that had actually been done.

- Bradford's ineffective assistance claims were not limited to the contention that Bradford's counsel failed to request blood-testing results that were assertedly in the State's possession. These claims relied on the further assertions that Bradford's counsel was ineffective in failing (1) to request Bradford's time-of-arrest blood sample and arrange to have it tested (the remaining aspect of Claim 8(B)); and (2) to investigate and present certain additional evidence of Bradford's intoxication or mental impairments at the time of the murder (Claim 8(A)). The panel concluded that, even assuming *arguendo* that Bradford's counsel performed deficiently in failing to investigate and present additional evidence concerning Bradford's intoxication and mental condition at the time of the murder, the California Supreme Court could reasonably have determined that Bradford failed to establish prejudice. Because that conclusion is sufficient to require the denial of Bradford's habeas petition with respect to those claims, the panel did

not need to reach the question of whether, under *Coleman*, Bradford made a sufficient showing of prejudice to excuse his procedural default of those claims in state court.

The panel, accordingly, reversed the district court's judgment granting Bradford's habeas petition and vacating his first-degree murder conviction and the special-circumstance finding. The panel remanded for proceedings limited solely to resolution of Bradford's unresolved penalty-phase claims.

---

## COUNSEL

Katherine Farkas (argued), Deputy Federal Public Defender; K. Elizabeth Dahlstrom, Senior Litigator; Cuauhtémoc Ortega, Federal Public Defender; Office of the Federal Public Defender, Los Angeles, California; for Petitioner-Appellee.

Dana M. Ali (argued), Shira S. Markovich, and Xiomara Costello, Deputy Attorneys General; James W. Bilderback II, Senior Assistant Attorney General; Lance E. Winters, Chief Assistant Attorney General; Rob Bonta, California Attorney General; Office of the California Attorney General, Los Angeles, California; for Respondent-Appellant.

# OPINION

COLLINS, Circuit Judge:

In this habeas corpus proceeding filed by Petitioner Mark Alan Bradford, Bradford's custodian (hereafter, "the State") appeals the district court's judgment setting aside Bradford's conviction and death sentence in a California state court for the 1988 first-degree murder of Lynea Kokes. We reverse and remand.

## I

We begin by recounting the underlying facts concerning Kokes's murder before summarizing the investigation, trial, and post-trial proceedings leading up to this appeal.

## A

In connection with her new role as its resident manager, Lynea Kokes planned to move on April 18, 1988 into the Panorama City Lodge ("the Lodge"), a building in Panorama City, California, that rented units on a monthly, weekly, or daily basis. After working with the movers at the Lodge, Kokes planned to meet her husband Alexander and their young son Jonathan at their prior residence at 6:00 PM, so that they could gather their remaining belongings and move into their new apartment at the Lodge. In addition to moving into the new apartment that day, Kokes spent time in the Lodge's office on various tasks, including going over the books with one of the outgoing assistant managers, Joseph Stevens, who arrived at the Lodge around 11:00 AM.

On the morning of that same day, Bradford and his roommate Randall Beerman, who lived in an apartment at the Lodge down the hall from Kokes's new unit, began

drinking and playing cards. At around 10:00 or 11:00 AM, the two men began drinking from a fifth- or liter-sized bottle of Black Velvet whiskey that, when they started, was either one-half or three-quarters full. Within an hour or so, Bradford had drunk "three or four" shots of whiskey and a few beers. Sometime between noon and 1:00 PM, after Bradford had finished off what remained of the whiskey bottle, Bradford left and returned with a second, newly purchased bottle of Black Velvet whiskey that was of comparable size. On direct examination, Beerman testified that he saw Bradford drink "some" of the second bottle, that Beerman only drank "a shot or two," and that he had no personal knowledge of what happened to the rest of the bottle. However, after Beerman was confronted on cross-examination with his prior testimony at the preliminary hearing, Beerman stated that he was not sure that he (Beerman) had actually drunk any of the second bottle, and he agreed that Bradford "drank most of the second bottle" himself over the course of the afternoon until "there was a quarter left."

At some point while drinking the second bottle, Bradford felt sick and stepped out of the apartment to "get some air." Outside, he observed Kokes moving boxes into an apartment unit down the hall. Bradford volunteered to assist her, and Kokes accepted the help. After helping Kokes move boxes for about 30–45 minutes, Bradford went back to his apartment, sometime around 2:00 PM. Bradford told Beerman that he was helping the new manager move in, and he described her as "good-looking" and stated that he would "bet money" that "he'd get her in bed that day while her husband was gone." Beerman testified that, during this conversation, Bradford "didn't seem drunk," was coherent, and was able to "walk all right" and "take care of himself."

At approximately 2:00 PM, Stevens, the outgoing assistant manager, left the Lodge and locked the door to the back office. He went to the home of his cousin Jack, who was also a manager at the Lodge. Stevens and Jack returned to the Lodge at around 3:30 PM, after being summoned back by Kokes, who had called Jack. Upon their arrival, Stevens and Jack met with Kokes and two other Lodge employees (a maid and a maintenance man), and he discovered that a glass panel into the locked office had been broken by someone in order to get into the office.

Based on information from the maid, Stevens summoned Bradford to the office and told him that he needed to leave the Lodge because he had been "identified as going into the office" and because he was already late on his rent. During this conversation, Bradford was carrying a bottle of whiskey that was about "half full." At trial Stevens described Bradford at this point as "kind of intoxicated," although he still "walked pretty good" and "talked pretty good with the exception of a slur here or there." Bradford denied breaking into the office, and he turned to Kokes and said, "You are the new manager. I want you to take care of me." Stevens testified that, in making this comment, Bradford's expression towards Kokes was "leering." Kokes left the office shortly thereafter to meet some movers who had arrived, and Stevens and Bradford continued arguing for a total of about 10–15 minutes. Bradford ultimately left after Stevens falsely told him that he had called the police.

After Bradford left, Stevens ultimately did call the police shortly after 5:00 PM. Although the police said that they would respond, no one had arrived by 6:30 PM, and Stevens called the police again. By 7:00 PM, the police still had not arrived, and Stevens at that point left to go have dinner with Jack at his home.

Meanwhile, after leaving the office, Bradford went to speak with Kokes in her apartment. Bradford then assisted Kokes and one or two movers with moving boxes, and he was still doing so when Philip Hall, a pool contractor, arrived to discuss with Kokes the repairs that needed to be made to the Lodge's pool and spa. Hall and Kokes then left the apartment and went down to the pool area, where Hall reviewed with her the work that he believed needed to be done. When Hall and Kokes left the apartment, so did Bradford. After speaking with Kokes by the pool area, Hall left the Lodge at around 5:00 PM, and Kokes returned to her apartment. Hall testified at trial that, although he did not speak with Bradford and only saw him take a few steps, Bradford "didn't appear to be under the influence of anything."

After Kokes returned to her apartment, Bradford again stopped by, and Kokes let him inside.[1] Bradford asked Kokes if it would be possible to work out an arrangement for his overdue rent, and she agreed to see what she could do the following day. Without any warning, Bradford then seized Kokes by the throat and choked her until she fell down. While she was lying on her back gasping for air and losing consciousness, he removed most of her clothes and then began to rape her both vaginally and anally. Kokes began to recover from the choking, but at that point, Bradford began hitting her with his fists until he knocked her out. As a result of the beating, Kokes began bleeding out of her nose and was choking in her own blood. Although Bradford did not recall

---

[1] The facts concerning what Bradford did following his return to Kokes's apartment are based on a post-arrest statement made by Bradford to Detective Melvin Arnold two days after the murder.

doing so, he bit off Kokes's nipples during the attack. Bradford then returned to his apartment.

Beerman was soundly asleep when Bradford returned and did not wake up at that point. Bradford took a shower in order to wash off Kokes's blood, which was "all over" him. Bradford was in his apartment for about 45 minutes, and he began to worry that Kokes might survive the assault and "rat[] [him] off" and that he would "get in trouble." Bradford also said that he was troubled by the thought that Kokes was still alive and "suffering." Bradford then took a kitchen knife owned by Beerman (who was a chef) and went back to Kokes's apartment to "mak[e] sure she was dead." When Bradford returned to Kokes's apartment, she was lying on her side, still "gasping for air" and bleeding from her nose. Bradford found a belt on the floor, put it around Kokes's neck, and pulled on it to "[c]hoke her." Bradford next turned her onto her stomach, "grabbed the back of her head and tipped her head up and sliced her throat twice" with the knife. Bradford then rolled her onto her back and began stabbing her multiple times in the chest area. Bradford stabbed her with such violence that the knife broke during the attack. Bradford "figured she ought to be dead after all that." Bradford put the two pieces of the knife in his back pocket, took Kokes's wallet, and then left and locked the apartment.

Sometime before Stevens called the police a second time at 6:30 PM, Stevens went to deliver a rent receipt to a tenant who lived near Bradford, and he saw Bradford in the hallway, dressed only in jeans. Bradford's hair was wet, and he was carrying a towel. Stevens told Bradford again that he had called the police and that Bradford "had better leave." Bradford said, "I really got to get the hell out of here," and he hurried back into his apartment. At some point before

6:30 PM, Bradford called one of his ex-girlfriends, Pamela DeLong, to tell her that he was going to Colorado and that he planned to stop by her home near Fresno on the way. According to DeLong, Bradford did not sound inebriated over the phone.

At around 6:00 PM, Beerman awoke to sounds in the bathroom and observed Bradford changing his clothes and packing up some of his belongings. Beerman noticed that there was blood on Bradford's knuckles, which "looked like they had been beat up." Bradford said that the bruises on his knuckles were from hitting the wall in anger. Bradford also told Beerman about how Stevens had accused him of breaking into the Lodge's office, and he said that Stevens had given him 30 minutes to leave.

Bradford had vomited in the bathroom, which Beerman assumed "was from drinking." Bradford cleaned up the vomit with bathroom towels, and Beerman then went with him down to the laundry room and paid for him to wash the towels. When they returned to the apartment, Beerman noticed the handle of one of his knives lying on the bathroom floor. Bradford asked Beerman for a ride to Fresno, saying that he would stay with a woman that he knew there. Beerman said that, if they were being kicked out of the apartment, he needed time to pack up, because he had "quite a bit of stuff" there. After Beerman attempted to contact a friend to ask for help packing, he and Bradford went to McDonald's and brought back their dinner to the apartment. Beerman went down to the laundry room to move the towels from the washer to the dryer. As he did so, he found the blade of the knife, which he placed by the side of the washing machine. Due to the blade's missing tip, Beerman recognized it as the blade that went with the knife handle he had seen earlier.

Meanwhile, Kokes's husband Alexander arrived at their former residence shortly before 6:00 PM, when he was supposed to meet Kokes. Kokes was not there, so Alexander proceeded on his own to pick up their son Jonathan from the nearby babysitter. He then packed up their remaining belongings and, when Kokes still had not shown up, he headed over with Jonathan to the Lodge. He went to their new apartment, but it was locked and it appeared that no one was there. He went down to the office to wait for the manager to return. After Stevens and Jack arrived back around 8:00 PM, Stevens gave Alexander a key to the apartment. Still holding Jonathan, Alexander opened the door to the apartment and saw his wife's body on the floor with her throat cut. He immediately ran downstairs, screaming for Stevens to call 911, and he then handed Jonathan to Jack and ran back upstairs to check on Kokes. Alexander could not find a pulse and realized that she was dead. Police and paramedics arrived minutes later.

Beerman and Bradford were in their apartment when the police and paramedics arrived. The two men and their neighbors went into the corridor to see what was going on. After they had been standing around for about 10 or 15 minutes, Beerman said, "I wonder what happened down there," and Bradford responded, "Some gal got killed down there." Beerman and Bradford returned to their apartment. A police officer who was questioning residents stopped by their apartment, asked Beerman if he had heard anything about 30–60 minutes earlier, and Beerman said that he had not. Bradford did not speak with the officer; he told Beerman that he was afraid to speak with her due to an outstanding arrest warrant from Arkansas. Beerman asked Bradford what he knew about what happened, and Bradford said that the new manager had gotten "beat up, raped, and

her throat slashed open." After calling his father to discuss things, Beerman went and talked to the police who were on scene. Beerman then led the police back to the apartment, where Bradford was arrested. He also led police to the laundry room, where the knife blade was still where he had left it.

Forensic examination of Kokes's body revealed that she had been stabbed seven times, with four of those stabs penetrating her heart, four passing through her lungs, and five fracturing her ribs. Kokes's nasal bone was fractured in multiple places, and part of her larynx was also fractured. The deputy medical examiner testified at trial that Kokes's death was caused by the combination of the stab wounds and the strangulation and that the throat slashings were too "superficial" to have contributed to her death.

**B**

In the days following his arrest, Bradford gave four statements to the police, but the only ones that are relevant to this appeal are the two statements that, in Bradford's prior appeal, we held were properly admitted as substantive evidence at the trial. *See Bradford v. Davis* ("*Bradford I*"), 923 F.3d 599, 607 (9th Cir. 2019) (noting that two of Bradford's statements were suppressed by the state trial court); *id*. at 617–18, 620–21 (holding that the California Supreme Court reasonably concluded that the relevant portions of the other two statements were admissible).

Bradford gave the first relevant statement to Officer Synthia Gordon, who was one of the officers who booked him into jail on April 19, 1988, the day after the murder. While another officer was taking Bradford's fingerprints, Officer Gordon took the prints of a detective who needed them for licensing purposes. The detective asked Bradford

why he was there, and he said, "Murder." None of the officers asked any further questions, and approximately two minutes passed before Bradford spoke up on his own and began recounting the details of the murder. He stated that he had been helping Kokes move into the apartment and that he then choked her and raped her while she gasped for air. Bradford said that, after the rape, he returned to his apartment "to clean up," but he then "realized she wouldn't die from just strangling her," and so "he returned to kill her."[2]

The following day, Bradford gave the second relevant statement in a Mirandized interrogation that was conducted by Detective Arnold. *See Bradford I*, 923 F.3d at 620. This detailed statement was recorded, and that recording was played back to the trial jury, which also received a 41-page transcript of the statement to help them follow along as the recording was being played.[3] In this statement, Bradford described the events surrounding the murder in considerable detail, as recounted in our earlier summary. In particular, he

---

[2] After being prompted by questioning from Officer Gordon, Bradford further stated that, after returning to Kokes's apartment, he first slit her throat and then stabbed her, saying that he "just wanted to be sure" that she was dead. *People v. Bradford*, 929 P.2d 544, 557 (Cal. 1997). Bradford also stated that "the officers had told him that he had cut off her breasts," but he said that he could not recall doing that. Bradford said that "he had something to drink," but he maintained that "he was not drunk." In her subsequent written report concerning this exchange, however, Officer Gordon failed to include Bradford's statement that he was not drunk. The California Supreme Court held that these additional portions of Bradford's first statement were improperly admitted, but that the error was harmless. *Id*. at 562–64.

[3] We grant the State's unopposed motion to take judicial notice of Bradford's recorded confessions, which were "part of the state court record before the California Supreme Court." *See Bradford I*, 923 F.3d at 615 n.7; FED. R. EVID. 201(b).

explained how, after he first went back to his apartment after the rape, he became concerned that Kokes would survive and so he decided to return to her apartment with the knife in order to make sure that she was dead and that she would not "rat[] [him] off."

In connection with Bradford's booking on the morning after the murder, law enforcement agents collected a blood sample from Bradford, as well as a swab of his saliva. According to the contemporaneous medical record from the blood drawing, the sample was taken at 6:32 AM on April 19, 1988—approximately 13 hours after the murder. According to the pre-printed information on the form, the blood was drawn into a tube "contain[ing] an anticoagulant and preservative consisting of Potassium Oxalate 20 mg. and Sodium Fluoride 25 mg." The coroner's office also collected a blood sample from Kokes's body. Both Bradford's and Kokes's blood samples were subjected to serological testing in order to determine their respective blood types. That analysis revealed that Bradford had type "B" blood and that he was a "secreter," meaning that he was among the subset of people who secrete their blood type's antigen into their other bodily fluids, such as saliva and semen. Kokes, by contrast, had a blood type other than "B."

Examination of the vaginal swabs taken from Kokes's body disclosed the presence of semen, but no type "B" blood antigens were found in the swabs. At trial, a forensic analyst explained that, due to natural processes occurring after death, this sort of inconclusive result was "not uncommon" in cases involving deceased victims, and that the absence of type "B" blood markers therefore did not mean that Bradford could be "ruled out" as the contributor. Serological testing was conducted on the blood stains found on the pants, shirt, and shoes that Bradford had worn at the time of the murder,

as well as on the knife blade, and the blood type was found to be "consistent with" Kokes's blood type. "[A]lso[] present on some of these stains" were traces of bodily fluids that were "consistent with" Bradford's blood type. No DNA analysis was performed on any of these items of evidence or on the blood samples drawn from Bradford and Kokes.

## C

In early 1990, Bradford was tried on five charges in connection with Kokes's killing: first-degree murder, residential robbery, forcible rape, forcible sodomy, and burglary. The State sought the death penalty based on several statutory special circumstances that were charged in connection with the murder count. The State's case rested on the testimony and evidence described above. *See supra* sections I(A), (B).

At the guilt phase, Bradford's trial counsel, Dennis Cohen, waived giving an opening statement. Cohen also presented no witnesses or evidence, instead relying on his cross-examination of the State's witnesses. In his closing argument at the guilt phase, Cohen emphasized three key points. First, Cohen argued that, in light of the evidence concerning Bradford's drinking and intoxication, there was a reasonable doubt as to whether Bradford "meets the legal standard of premeditation and deliberation" required to convict him of first-degree murder. Therefore, Cohen argued, the jury at most could convict Bradford only of second-degree murder. In support of this defense theory, Cohen had requested, and the trial court agreed to give, jury instructions concerning the consideration of voluntary intoxication in determining whether Bradford formed the specific intent necessary with respect to the first-degree murder, robbery, and burglary charges. Second, Cohen

attacked the evidentiary sufficiency of the State's alternative theory that Bradford was guilty of first-degree felony murder because he had killed Kokes during or in flight from the underlying crimes of rape and sodomy. Third, Cohen argued that there was a reasonable doubt as to Bradford's intention when he entered Kokes's apartment and that he therefore was not guilty of burglary.

With respect to the intoxication issue, the prosecutor argued in her initial closing argument that, while it was clear that Bradford "had something to drink" on the day of the murder, "there [wa]s no evidence whatsoever that he was intoxicated, that he couldn't form any of the specific intents to do any of the crimes that he did, that he couldn't deliberate, that he couldn't premeditate." In her rebuttal closing argument, the prosecutor emphasized three points in contending that the record evidence concerning Bradford's drinking did not raise a reasonable doubt about whether he acted with premeditation and deliberation. First, the prosecutor argued for a reading of the evidence that would limit the amount of the two bottles of whiskey that Bradford may have drunk. She argued that Beerman could not remember if the first bottle "was half full or three quarters full when they started" drinking it and that, given the record evidence, it was "pure speculation that [Bradford] drank th[e] whole second bottle himself or half of the second bottle." Second, the prosecutor contended that the testimony provided by Beerman, DeLong, and the officers present at the booking showed that Bradford was coherent and that his drinking did not affect his ability to act deliberatively. Third, the prosecutor emphasized the extent to which Bradford, during the booking and then again in his later statement to Detective Arnold, recounted in "amazing" detail his own deliberative process in deciding to go back to Kokes's

apartment in order to make sure that she was dead, as well as the specific actions he took when he killed Kokes.

The jury convicted Bradford of first-degree murder, and it also found the special circumstance that Bradford had murdered Kokes "for the purpose of preventing her testimony in a criminal proceeding." While the jury thus rejected Cohen's arguments concerning the intoxication issue, it apparently agreed with the other two points that Cohen made, because the jury's verdict expressly rejected the State's alternative first-degree felony-murder theory, and the jury acquitted Bradford of burglary.

At the penalty phase, the State presented no new evidence and instead rested on its case in chief from the guilt phase. Bradford's attorney, Cohen, presented testimony from various witnesses, including two friends of Bradford's parents (who testified about the parents' verbal abuse of Bradford), DeLong (who "testified regarding [Bradford's] care of and attention to her during their several-month relationship"), and a teacher working at the county jail (who "testified that [Bradford] had performed well as both his assistant and as a student").

Cohen also presented testimony from Dr. George Thompson, an expert who testified about the effect of alcohol on Bradford's brain. Dr. Thompson discussed an examination he conducted of Bradford, in which Dr. Thompson performed an electroencephalogram ("EEG") test on Bradford and then repeated the test after Bradford consumed increasing amounts of 80-proof alcohol. Dr. Thompson opined that, based on the results of the EEG test, Bradford suffered from "acute pathological alcoholic intoxication" ("APAI"). Dr. Thompson described this condition as resulting from an underlying brain pathology

(in Bradford's case, a traumatic injury from a 1977 accident) that then causes the person to respond abnormally to the consumption of alcohol. Dr. Thompson stated that, for such persons, consuming even small quantities of alcohol could trigger abnormal brain activity that can lead to "aggressiveness," an inability "to follow the rules of behavior," and partial or complete amnesia. Dr. Thompson testified that, in his examination of Bradford, Bradford stated that he remembered raping Kokes and going back to her apartment with a knife, but that he had "no recollection of anything else." On cross-examination, Dr. Thompson acknowledged that he was unaware of Bradford's detailed statements to the police, and the prosecutor asked Thompson whether this evidence of a lack of amnesia would change his opinion as to whether Bradford was suffering from APAI. Dr. Thompson adhered to his view, relying on the EEG examination and Bradford's statements to Dr. Thompson.

In rebuttal, the State then presented testimony from an expert, Dr. Ronald Markman, who opined that Bradford "did not have 'idiosyncratic intoxication,' a more modern name for APAI." Dr. Markman stated that, in his view, Bradford's continued ability to drink alcohol on the day of the murder "excluded that diagnosis." Dr. Markman also stated that "partial or full amnesia was 'one of the major phenomen[a]' associated with APAI" and that Bradford's "detailed statement to police 'negate[d] the suggestion that there was any amnesia.'" The State also called Bradford's cousin as a witness, and he testified that Bradford's parents "treated him normally, and did not ridicule [him] or punish him excessively."

At the conclusion of the penalty phase, the jury recommended the death penalty, and the trial court sentenced Bradford accordingly.

**D**

Bradford appealed his conviction and sentence directly to the California Supreme Court. *See* CAL. CONST. art. VI, § 11(a). On January 23, 1997, the California Supreme Court reversed Bradford's conviction on the robbery charge due to instructional error, but it otherwise affirmed the judgment. *People v. Bradford*, 929 P.2d 544, 575–77, 581 (Cal. 1997). The U.S. Supreme Court denied Bradford's petition for a writ of certiorari on November 3, 1997. *See Bradford v. California*, 522 U.S. 953 (1997).

Following the California Supreme Court's decision, Bradford's appointed counsel requested multiple "extensions of time and additional funds to prepare Bradford's state habeas petition, but he never filed the petition." *Bradford I*, 923 F.3d at 608. On August 19, 1997, Bradford filed in the district court a request to appoint counsel to represent him in federal habeas proceedings. *Id*. On September 15, 1997, the district court appointed the Office of the Federal Public Defender ("FPD") to represent Bradford, and on October 30, 1998, the FPD filed Bradford's first federal habeas petition, along with an accompanying notice of his unexhausted claims. *See id*.

On January 6, 2000, the FPD ultimately filed Bradford's state habeas petition in the California Supreme Court, and the district court stayed the federal habeas proceedings while the state habeas proceedings were pending. *Bradford I*, 923 F.3d at 608.

As relevant here, Claim 4 of Bradford's state habeas petition alleged, "[o]n information and belief," that the blood sample that was drawn from Bradford on the morning after the murder was "processed . . . as a sample for blood alcohol and drug analysis," but that, in violation of *Brady v.*

*Maryland*, 373 U.S. 83 (1963), the results of this blood-alcohol testing "were never disclosed" to Bradford.  In support of this contention, the petition noted that the then-applicable guidance from the California Department of Justice Bureau of Forensic Services stated that, in contrast to samples drawn for other purposes (such as for DNA testing, which would be collected in a "lavender-stoppered tube"), a blood sample drawn for "blood alcohol or drug analysis" should be collected in a "gray stoppered tube" that "contain[ed] potassium oxalate/sodium fluoride."  Because the medical record from Bradford's April 19, 1988 blood draw stated that the sample was collected into a tube containing "Potassium Oxalate 20 mg. and Sodium Fluoride 25 mg.," the petition argued that this meant that the sample was likely subjected to blood-alcohol testing.  The petition also noted that, at a June 9, 1989 pretrial hearing, the prosecutor sought a further blood sample from Bradford and that, in doing so, the prosecutor explained that the new sample might be used for DNA testing and that, "apparently when blood was taken from Mr. Bradford at the time of the arrest, they were told to use a purple cap tube instead of a gray cap tube that would be used, so the [new] blood [sample] will be helpful in any further testing with regard to standard tests that have already been done in this case as well."  The petition argued that this comment indicated that Bradford's April 19, 1988 blood draw was collected into a "gray-stoppered tube" and that this further confirmed that it was thereafter subjected to blood-alcohol testing, the results of which were never disclosed.

In support of his state habeas petition, Bradford also submitted a declaration from Dr. Robert Koda, then a professor of pharmaceutical sciences at the University of Southern California.  Dr. Koda estimated that, based on three

different scenarios provided by defense counsel as to how much alcohol Bradford may have drunk on the day of the murder, the "most conservative estimate" of Bradford's blood-alcohol level shortly before the murder would be 0.497%—well past the ordinary 0.08% legal standard for intoxication—and that the corresponding level at the time of Bradford's blood draw at about 6:30 AM the next day would have been 0.227%. Based on this estimate, Bradford's petition asserted that the allegedly suppressed blood-alcohol testing involved significant exculpatory evidence that would have supported Bradford's arguments at trial that he did not have the requisite mental state for first-degree murder and that he did not deserve the death penalty.

In Claim 8 of his state habeas petition, Bradford alleged ineffective assistance of counsel during pretrial proceedings and the guilt phase of his trial in violation of his Sixth Amendment rights under *Strickland v. Washington*, 466 U.S. 668 (1984). In particular, Claim 8(A) alleged that Bradford's defense counsel had been ineffective in failing to investigate and present additional evidence of intoxication and mental impairments at the time of the crime. Claim 8(B) alleged that Bradford's counsel had been ineffective in allegedly failing to request the results of the "toxicological testing" performed on Bradford's post-arrest blood sample and in failing to conduct his own testing of that blood sample.

On August 29, 2001, the California Supreme Court summarily denied the habeas petition. In particular, the court denied Claims 4 and 8 "on the merits," and alternatively denied them as "untimely" under state law.

## E

In November 2001, Bradford filed an amended federal habeas petition that reasserted, *inter alia*, Claims 4 and 8

(and that denominated them in the federal petition using those same numbers).  On May 1, 2012, the district court issued an order disposing of Bradford's claim challenging the admission of his inculpatory statements with Officer Gordon during his booking and during his later interview with Detective Arnold (Claim 1).  The district court held that all of Bradford's statements were involuntary but that this error only required vacatur of his death sentence and not his underlying convictions.  Thereafter, on October 21, 2014, the district court issued a further order disposing of the remaining guilt-phase claims.  With respect to Claims 4 and 8, the district court held that both were procedurally defaulted under *Coleman v. Thompson*, 501 U.S. 722 (1991), due to Bradford's failure to timely present them in state court.  The district court held that, under *Coleman*, California's timeliness rule for state habeas petitions was an "adequate and independent procedural bar" and that Bradford had failed to demonstrate either "cause" to excuse his state-law procedural default or that a "fundamental miscarriage of justice" would result from a failure to consider these claims.

Concluding that the remaining penalty-phase claims were moot, the district court entered judgment on December 4, 2015 rejecting Bradford's challenges to his conviction but setting aside the jury's finding of special circumstances and Bradford's sentence of death.  The district court issued a certificate of appealability that, as subsequently amended, allowed Bradford to appeal the rejection of his guilt-phase claims, including Claims 4 and 8.  Bradford appealed, and the State cross-appealed.  The district court stayed its judgment pending the appeals.

We reversed both the district court's grant of partial relief as to Claim 1 and its dismissal of Claims 4 and 8.  *Bradford I*,

923 F.3d at 622.  With respect to Claim 1, we applied the deferential standards set forth in 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA"),[4] and under those standards we upheld the California Supreme Court's conclusions that all of Bradford's various incriminating statements were voluntary. *Bradford I*, 923 F.3d at 615–21.  We further held that the California Supreme Court reasonably concluded that Bradford's detailed confession to Detective Arnold was properly admitted.  *Id*. at 621.  As to the statements that Bradford made during his booking in response to un-Mirandized questioning by Officer Gordon, the California Supreme Court had held on direct appeal that their admission was harmless beyond a reasonable doubt.  *People v. Bradford*, 929 P.2d at 564.  In reviewing this issue under the tests applicable on collateral habeas review, we applied the "less onerous standard" of *Brecht v. Abrahamson*, 507 U.S. 619 (1993), and held that Bradford had failed to show under *Brecht* that the admission of these booking statements at trial was prejudicial.  *Bradford I*, 923 F.3d at 619.  We therefore reversed the district court's grant of habeas relief with respect to Claim 1.

With respect to the certified guilt-phase claims, Bradford's opening brief challenged only the district court's rejection of Claims 4, 6, and 8.  *See Bradford I*, 923 F.3d at 609.  Claim 6 involved a claim "that the prosecution suppressed various notes from witness interviews conducted by the police."  *Id*. at 614.  With respect to his ineffective

---

[4] As discussed further below, *see infra* section III, under AEDPA's deferential standards, habeas relief is generally available, with respect to a federal claim rejected by a state court on the merits, "only if the state court's decision is objectively unreasonable."  *Yarborough v. Alvarado*, 541 U.S. 652, 665 (2004).

assistance claim (Claim 8), Bradford's opening brief asserted that he could show cause and prejudice to excuse his procedural default only with respect to his counsel's failure to present "evidence of intoxication and mental disorder" to support a "mental state defense."[5]  We first agreed with the district court that California's requirement that state habeas relief be timely sought was an adequate and independent state procedural rule, and that Bradford's procedural default in failing to timely raise Claims 4, 6, and 8 required him to show cause and prejudice to excuse the procedural default. *See Bradford I*, 923 F.3d at 611–12 (citing *Coleman*, 501 U.S. at 750).  We held that, in light of "the confluence of several factors," including Bradford's state appellate counsel's failure to file a state habeas petition despite requesting extensions of time and funds to do so, Bradford had shown cause for his procedural default.  *Id*. at 612–13. Turning to the issue of prejudice, we held that Bradford "cannot establish prejudice for Claim 6."  *Id*. at 614.  As to Claims 4 and 8, however, we remanded "for the district court to conduct the prejudice inquiry in the first instance."  *Id*. at 615.

Finally, we rejected Bradford's request that we expand the certificate of appealability to include his contentions that his convictions (and not just his sentence) should have been set aside based on Claim 1 and that cumulative error justified habeas relief (Claim 12).  *Bradford I*, 923 F.3d at 609, 622. We noted that we had rejected Claim 1 on the merits in full and that, because we remanded Claims 4 and 8 to the district court on the issue of prejudice, there was no basis for a

---

[5] These arguments corresponded to subclaims 8(A) and 8(B) of Claim 8. Bradford's brief presented no arguments concerning subclaims 8(C)–8(G), which concerned other, unrelated asserted deficiencies in counsel's performance.

"cumulative" error claim at that stage of the litigation. *Id*. at 622.

On remand, the district court granted relief with respect to Claims 4 and 8 and set aside Bradford's conviction for first-degree murder but not his convictions for rape or forcible sodomy. The district court began by noting that the merits of the *Brady* and ineffective assistance claims raised in Claims 4 and 8, respectively, both included a prejudice component and that, as a result, the resolution of the merits of those two claims would also resolve the issue of prejudice to excuse the procedural default of those claims under *Coleman*. That is, because a finding that the requisite prejudice had been shown as to the merits of these two claims "under the more restrictive AEDPA standards" would necessarily mean that prejudice existed under the de novo standards applicable to "the *Coleman* prejudice analysis required to resolve the procedural default issue," the district court concluded that it sufficed to consider Claims 4 and 8 "under only the more restrictive AEDPA standards."

Turning to the merits of these claims under AEDPA's standards, the district court held that Bradford's state habeas petition presented a sufficient prima facie case that Claims 4 and 8 had merit and that the California Supreme Court's conclusion to the contrary was unreasonable. *See Cullen v. Pinholster*, 563 U.S. 170, 188 n.12 (2011) ("Under California law, the California Supreme Court's summary denial of a habeas petition on the merits reflects that court's determination that 'the claims made in th[e] petition do not state a prima facie case entitling the petitioner to relief.'" (citation omitted)). Having concluded that AEDPA's bar on habeas relief in § 2254(d) therefore did not apply, the district court further concluded, on "de novo review," that Claims 4, 8(A), and 8(B) had merit and warranted habeas relief. As to

the scope of the relief, the district court vacated Bradford's first-degree murder conviction, the finding of special circumstances, and the sentence of death, but the district court denied relief as to Bradford's rape and forcible sodomy convictions.  The district court stated that Claims 8(C)–(G) were dismissed "as moot."  The district court stayed its judgment pending any appeal by the State.

The State timely appealed the district court's judgment. *See* FED. R. APP. P. 4(a)(1)(A); RULES GOVERNING § 2254 CASES, R. 11(b).  Bradford did not cross-appeal the district court's partial denial of relief.  We have jurisdiction under 28 U.S.C. §§ 1291 and 2253(a).

## II

As noted earlier, we held in *Bradford I* that Claims 4 and 8 were procedurally defaulted and that, under *Coleman*, Bradford was required to show cause and prejudice to excuse that procedural default.  *See Bradford I*, 923 F.3d at 610–12. We further held that Bradford had shown "cause" for the default, but we remanded "for the district court to conduct the prejudice inquiry in the first instance." *Id*. at 615.  As the district court correctly recognized on remand, this *Coleman* prejudice inquiry overlaps with the prejudice elements of the merits of Claim 4 (the *Brady* claim) and Claim 8 (the *Strickland* claim).  That overlap raises threshold questions as to the order in which we address the relevant issues and the standards of review that we apply to those issues.  We therefore turn first to resolving those threshold questions.

In *Lambrix v. Singletary*, 520 U.S. 518 (1997), the Supreme Court clarified that, in the context of a federal habeas petition brought by a state prisoner, a state court ruling that a particular federal challenge to the conviction has been procedurally defaulted does *not* present a

"jurisdictional" defect. *Id*. at 523. Thus, while on direct appeal from the state appellate courts to the U.S. Supreme Court, an adequate and independent state-law procedural ground will be "sufficient to sustain the decree" on non-federal grounds and to deprive the Supreme Court of jurisdiction to directly review that judgment, the same is not true in the habeas context, in which a "federal court is not formally reviewing a judgment, but is determining whether the prisoner is 'in custody in violation of the Constitution or laws or treaties of the United States.'" *Id*. (quoting 28 U.S.C. § 2254(a)). Because a state court procedural-default ruling does not deprive a federal habeas court of jurisdiction, any such issue of procedural default does not implicate the rule that "Article III generally requires a federal court to satisfy itself of its jurisdiction over the subject matter before it considers the merits of a case." *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101–02 (1998)).

Instead of being grounded in jurisdictional concerns, "[a]pplication of the 'independent and adequate state ground' doctrine to federal habeas review is based upon equitable considerations of federalism and comity." *Lambrix*, 520 U.S. at 523. In light of those considerations, the Supreme Court held, "the procedural-bar issue should ordinarily be considered first." *Id*. at 524. The Court also stated, however, that it did "not mean to suggest that the procedural-bar issue must invariably be resolved first; only that it ordinarily should be." *Id*. at 525. Noting that the habeas statute expressly allows "a federal court to *deny* a habeas petition on the merits notwithstanding the applicant's failure to exhaust state remedies," the Court held that "[j]udicial economy" might likewise counsel in favor of addressing another issue first—such as, in *Lambrix*, the non-

retroactivity doctrine of *Teague v. Lane*, 489 U.S. 288 (1989)—if that issue "were easily resolvable against the habeas petitioner." *Lambrix*, 520 U.S. at 525 (emphasis added).

For several reasons, we conclude that, under *Lambrix*, it is appropriate in this case to address the merits of Bradford's relevant claims before addressing any issue of whether, under *Coleman*, Bradford has shown prejudice sufficient to excuse his state-law procedural default.

First, as the district court correctly recognized, the merits of each of Bradford's two relevant claims contain a prejudice component that overlaps with the *Coleman* prejudice inquiry. Claim 4 alleges that the State withheld exculpatory evidence (namely, the alleged results of blood-alcohol testing on Bradford's blood sample) in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). To establish that a *Brady* violation warrants relief, "a convicted defendant must make each of three showings: (1) the evidence at issue is favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) the State suppressed the evidence, either willfully or inadvertently; and (3) prejudice ensued." *Skinner v. Switzer*, 562 U.S. 521, 536 (2011) (simplified). Likewise, the ineffective assistance of counsel claim asserted in Claim 8 requires a showing that (1) "counsel's performance was deficient"; and (2) "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Because the "prejudice" inquiry under *Coleman* requires a showing of "prejudice from the denial of a federal right," *Buck v. Davis*, 580 U.S. 100, 110–11 (2017), the *Coleman* prejudice inquiry necessarily "parallel[s]" the "prejudice" component of the merits of the underlying claims that were procedurally defaulted. *Strickler v. Greene*, 527 U.S. 263, 282 (1999)

(making this point in the context of a procedurally defaulted *Brady* claim).

Second, the standard of review applicable to the prejudice component of the merits of Bradford's *Brady* and *Strickland* claims is more deferential than the standard that applies to the *Coleman* prejudice inquiry. The merits of Bradford's federal petition are governed by AEDPA, which requires us to consider not whether we believe that the California Supreme Court's determination of the merits of a claim "was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citation omitted).[6] Moreover, our review of the prejudice component of the merits of Bradford's claims is limited to the state court record, *see* 28 U.S.C. § 2254(e)(2), and therefore any additional evidence that may have been offered in federal court with respect to *Coleman* prejudice may not be considered in examining the merits of the claims under AEDPA. *See Shinn v. Martinez Ramirez*, 596 U.S. 366, 389–90 (2022). By contrast, our examination of whether, in federal court, Bradford has shown sufficient prejudice to excuse his procedural default under *Coleman* is a question as to which we exercise independent, de novo review. *See Visciotti v. Martel*, 862 F.3d 749, 769 (9th Cir. 2016); *Bradford I*, 923 F.3d at 614 & n.6 (explaining that, due to the distinct standards of review, a petitioner might make a showing of prejudice sufficient to excuse the procedural default but lose on the merits under AEDPA's deferential standards).

---

[6] As we explain below, *see infra* section III, we reject Bradford's claim that the settled precedent governing AEDPA's deferential standard is no longer good law.

Given these two considerations, we conclude that, as in *Lambrix*, it is appropriate to address the merits of Bradford's claims under AEDPA before considering (if necessary) the procedural-bar issue under *Coleman*. If we were to uphold, under AEDPA's deferential standards, the state court's merits ruling concerning any prejudice component of Bradford's claims, then that merits "prejudice" issue would be more "easily resolvable against the habeas petitioner" than the *Coleman* prejudice inquiry. *Lambrix*, 520 U.S. at 525. Conversely, as the district court correctly recognized, if we were to hold that Bradford made a sufficient showing of prejudice in state court as to the merits of his claims even under AEDPA's deferential standards, then we would presumably conclude, under de novo review, that he had established sufficient prejudice to satisfy *Coleman*. Either way, as in *Lambrix*, "[j]udicial economy" in this case counsels in favor of first addressing the merits of Bradford's claims under AEDPA before addressing any issue of *Coleman* prejudice. *Lambrix*, 520 U.S. at 525. Similar considerations of judicial efficiency confirm that our review of the merits of Bradford's claims should not be limited to the prejudice aspect of those claims, but should also address whether any other merits-related ground is more "easily resolvable" against Bradford. *Id.*; *see also Lewis v. Andes*, 95 F.4th 1166, 1185 n.11 (9th Cir. 2024) (noting that, under *Lambrix*, it may be appropriate to reject a claim on the merits, notwithstanding an asserted procedural default).

## III

Before turning to the merits of Bradford's *Brady* and *Strickland* claims under AEDPA's deferential standards, however, we must address one further threshold issue about the standards under which we review the California Supreme Court's rejection of Bradford's *Brady* and *Strickland* claims.

Under AEDPA, a federal court cannot grant a petition for a writ of habeas corpus unless the relevant state court decision adjudicating the claim was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1); or was (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id*. § 2254(d)(2).  To establish that a state court decision rests on "an unreasonable application of clearly established Federal law" within the meaning of § 2254(d)(1), a habeas petitioner must "establish that the state court blundered so badly that every fairminded jurist would disagree with the decision." *Klein v. Martin*, 607 U.S. 213, 220–21 (2026) (simplified). This "highly deferential standard for reviewing claims of legal error by state courts," *Burt v. Titlow*, 571 U.S. 12, 18–19 (2013), serves to "sharply limit[] federal review of habeas claims raised by state prisoners," *Klein*, 607 U.S. at 220. Under this standard, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly"; "[r]ather, that application must also be unreasonable." *Williams v. Taylor*, 529 U.S. 362, 411 (2000) (*Terry Williams*).[7]

---

[7] "We refer to this case as '*Terry Williams*' because, in an extraordinary coincidence, the Supreme Court on the very same day decided another case named '*Williams v. Taylor*' (in which the petitioner was Michael Williams).  *See* 529 U.S. 420 (2000); *see also Shinn v. Martinez Ramirez*, 596 U.S. 366, 381 (2022) (similarly referring to the other case as '*Michael Williams*')."  *Apache Stronghold v. United States*, 101 F.4th 1036, 1059 n.6 (9th Cir. 2024) (en banc).

In his answering brief, Bradford argues that the Supreme Court's recent decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), "calls into question the prevailing judicial interpretations of section 2254(d)" and requires rejection of current precedent's highly deferential standard of review of state court merits decisions under AEDPA.  Bradford asserts that, in light of *Loper Bright*'s rejection of judicial deference to an executive branch agency's construction of federal law, the federal courts cannot give deference to the views of any "non-Article III actor," including a state court, with respect to a question of federal law.  Instead, Bradford contends, *Loper Bright* requires us to hold either (1) that the Constitution requires that federal habeas courts exercise "independent judg[]ment"—*i.e.*, undertake de novo review—in examining state court decisions; or (2) that, as a matter of statutory construction, AEDPA's "unreasonable application" standard must be reinterpreted as requiring only "respectful consideration" of the state court's decision, which Bradford analogizes to so-called "*Skidmore* deference" in the administrative-law context.  *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) (noting that, although an agency's view on a question of law may not be "controlling," it may be given respectful weight, "depend[ing] upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade"); *see also Gonzales v. Oregon*, 546 U.S. 243, 268 (2006) (describing such respectful consideration as "*Skidmore* deference").  We reject these contentions.[8]

---

[8] We reject Bradford's request, in his answering brief, for leave to file a further supplemental brief with respect to this issue.  The parties are expected to present all of their arguments in their principal briefs and, if

In *Loper Bright*, the Court addressed the continuing vitality of the "*Chevron* doctrine," under which a court generally must "defer" to an "agency's interpretation" of a statute it administers if Congress has not "directly spoken to the precise question at issue" and the agency's reading "is based on a permissible construction of the statute." *Loper Bright*, 603 U.S. at 379–80 (citation omitted). The Court concluded that "[t]he deference that *Chevron* requires of courts reviewing agency action cannot be squared with the APA." *Id*. at 396 (referring to the Administrative Procedure Act). Specifically, the Court cited the provision of the APA that is now codified in § 706 of Title 5 of the United States Code, which states that, in reviewing agency action, "the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." *Id*. at 391 (quoting 5 U.S.C. § 706). The Court held that § 706 "codifies for agency cases the unremarkable, yet elemental proposition reflected by judicial practice dating back to *Marbury* [*v. Madison*, 5 U.S. 137 (1803)]: that courts decide legal questions by applying their own judgment." *Id*. at 391–92. Given the "settled pre-APA understanding" that deciding legal questions "was 'exclusively a judicial function,'" the Court concluded that, if Congress had "intended to depart" from that

they believe it necessary, to request an increase in the word limit for those briefs. *See* FED. R. APP. P. 28(a)(8), (b); NINTH CIR. R. 32-4 (increasing the standard word limits in capital cases); NINTH CIR. R. 32-2(a) (authorizing motions to exceed the word limit and exempting "capital cases" from the otherwise applicable demanding standard for such motions). Here, Bradford neither requested additional words nor even used all of the words available to him under the rules (his brief is nearly 1,250 words under the limit). *See* NINTH CIR. R. 32-4. In any event, we find the discussion of the issue in Bradford's brief to be sufficient for its resolution here.

understanding, it "surely would have articulated a similarly deferential standard applicable to questions of law," as it did for "judicial review of agency policymaking and factfinding." *Id*. at 392 (citation omitted). Because the APA contains no such language, it "require[s]" a court to "exercise[] its independent judgment" in resolving questions of law. *Id*. at 399. The APA thus reflects that, in the context of judicial review of agency decisions, "Congress expects courts to do their ordinary job of interpreting statutes, with due respect for the views of the Executive Branch," which still may have "power to persuade, if lacking power to control." *Id*. at 402–03 (quoting *Skidmore*, 323 U.S. at 140).

As this summary of *Loper Bright* makes clear, the Supreme Court there addressed the respective allocation of authority, under the APA, between courts and Executive Branch agencies, and the Court concluded that the APA preserved and codified the pre-APA understanding that courts are to "exercise their independent judgment in deciding whether an agency has acted within its statutory authority." 603 U.S. at 412. This case, by contrast, (1) involves AEDPA rather than the APA; and (2) concerns collateral review of state court judgments, rather than administrative-law review of executive agency determinations. These crucial distinctions render *Loper Bright* inapposite here.

In contrast to the APA, the text of AEDPA *requires* that federal habeas courts apply a highly deferential standard in reviewing any state court decision that rejected a federal claim on the merits. As relevant here, § 2254(d) states that a writ of habeas corpus "shall not be granted" with respect to any such "claim that was adjudicated on the merits in State court proceedings *unless*" the state court's "adjudication of the claim . . . resulted in a decision that . . . involved an

*unreasonable* application of[] clearly established Federal law, as determined by the Supreme Court of the United States."**9**   28 U.S.C. § 2254(d) (emphases added).   Two features of this language are notable.

First, the language is prohibitive rather than permissive, meaning that the starting point for the reviewing federal court is denial of habeas relief "unless" and until one of the "demanding" exceptions in § 2254(d) is shown to be applicable. *Brown v. Davenport*, 596 U.S. 118, 134 (2022); *see also Pinholster*, 563 U.S. at 203 n.20 (stating that, where the petitioner has "failed to demonstrate" that one of the exceptions in § 2254(d) has been met, "a writ of habeas corpus 'shall not be granted' and our analysis is at an end"). As a result, the "availability of habeas relief is narrowly circumscribed" under AEDPA. *Shinn*, 596 U.S. at 375. As the Supreme Court has explained, Congress imposed these significant limitations in order to "respect our system of dual sovereignty." *Id*.; *accord Crater v. Galaza*, 491 F.3d 1119, 1123 (9th Cir. 2007).

Second, the relevant exception to § 2254(d)'s baseline prohibition on habeas relief is applicable only if the state court's application of federal law was "unreasonable."   28 U.S.C. § 2254(d)(1).   By "specifically us[ing] the word

---

[9] AEDPA contains an additional clause stating that a federal habeas court is not prohibited from issuing the writ if the state court decision was "*contrary to* . . . clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1) (emphasis added). Under *Terry Williams*, this standard is met (1) "if the state court arrives at a conclusion opposite to that reached by th[e] [Supreme] Court on a question of law"; or (2) "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Court's]." 529 U.S. at 405. Such direct defiance of Supreme Court precedent is fortunately rare, and this clause is not at issue here.

'unreasonable,' and not a term like 'erroneous' or 'incorrect,'" *Terry Williams*, 529 U.S. at 411, AEDPA's plain text requires deference to the state court's decision and thereby precludes the application of the sort of "independent judgment" that the APA requires with respect to questions of law, *Loper Bright*, 603 U.S. at 399.  Indeed, the Supreme Court in *Terry Williams* could not have been clearer in expressly rejecting any such exercise of independent judgment: "Under § 2254(d)(1)'s 'unreasonable application' clause, . . . a federal habeas court *may not* issue the writ simply because that court concludes *in its independent judgment* that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." 529 U.S. at 411 (emphasis added); *see also Klein*, 607 U.S. at 214 (noting that the deference required by AEDPA's standards "sometimes puts federal district courts and courts of appeals in the disagreeable position of having to deny relief in cases they would have analyzed differently if they had been in the shoes of the relevant state court").

AEDPA's mandate that federal courts defer to the state court's application of federal law thus precludes the exercise of independent judgment on collateral habeas review.  *Loper Bright*, by contrast, held that the APA expressly requires such independent judgment by federal courts in the administrative context.  Because AEDPA "mandates deferential review," *Loper Bright* "is not applicable" to AEDPA.  *Urias-Orellana v. Bondi*, 607 U.S. __, 146 S. Ct. 845, 854 n.6 (2026).

Bradford argues, however, that the "current" reading of AEDPA's standards raises serious constitutional concerns under *Loper Bright*, because it assertedly deprives the federal courts of their constitutional role to "have the last word on constitutional law."  At the very least, Bradford contends, this constitutional difficulty should be avoided by

now construing § 2254(d)(1) as requiring only "*Skidmore* deference"—meaning that a state court decision would be deemed to involve an "unreasonable application" of federal law if it fails to persuade in the sense that *Skidmore* describes.  Bradford's argument, in effect, is that, in light of the constitutional concerns he posits, we should now adopt the reading of AEDPA that Justice Stevens urged in his separate opinion in *Terry Williams* and reject the one adopted by the Court in that case.  *Compare Terry Williams*, 529 U.S. at 389 (opin. of Stevens, J.) (asserting that AEDPA preserves federal habeas courts' "independent judgment" and only requires them to "attend to every state-court judgment with utmost care" by "carefully weighing all the reasons for accepting a state court's judgment") *with id*. at 403 (majority opin.) (expressly rejecting this view, which would give "no effect whatsoever" to the amendments made by AEDPA). Bradford's arguments on this score are meritless.

Contrary to what Bradford contends, AEDPA's deferential standards present no constitutional difficulty under *Loper Bright*.  Bradford wrongly equates the "collateral review process Congress has prescribed" for administrative-law review of *federal executive agency decisions*, *Garland v. Ming Dai*, 593 U.S. 357, 367 (2021), with collateral review, on a petition for a writ of habeas corpus, of *state court judgments*.  *Loper Bright* emphasized that, in allocating power among the three branches of the federal government, the Framers sought to ensure that federal courts would be able to "exercise" their constitutional role to provide "the final interpretation of the laws" "independent of influence from the political branches."  603 U.S. at 385 (simplified).  Deferential collateral review of state court judgments under AEDPA does not present similar concerns, for at least two reasons.

First, Bradford overlooks the fact that final state court judgments in criminal cases (including final decisions in state court habeas cases rejecting federal constitutional claims) remain subject to *direct* appellate review in the U.S. Supreme Court under 28 U.S.C. § 1257(a). AEDPA's deferential standards do not apply to that direct review, which does not in any way rest on the federal habeas corpus power. AEDPA thus does *not* deprive the Supreme Court of its authority to provide the "final interpretation" of the federal Constitution or of federal law in direct review of state criminal cases.[10] *See*, *e.g.*, *Andrus v. Texas*, 590 U.S. 806, 813, 824 (2020) (granting relief on direct review of a state court habeas decision).

Second, Bradford's argument overlooks a "foundational principle of our federal system," namely, that "[s]tate courts are adequate forums for the vindication of federal rights." *Burt*, 571 U.S. at 19. As the Supreme Court has emphasized, "state courts have inherent authority, and are thus presumptively competent, to adjudicate claims arising under the laws of the United States," including "claimed violations of constitutional, as well as statutory, rights." *Id*. (simplified). In *Burt*, the Supreme Court reaffirmed that AEDPA "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court," and the Court held that AEDPA's deferential standards properly "[r]ecogniz[e] the duty and ability of our state-court colleagues to adjudicate claims of constitutional wrong." *Id*.

---

[10] In this case, Bradford sought review of his criminal conviction in the U.S. Supreme Court, which denied his petition for a writ of certiorari, *see Bradford v. California*, 522 U.S. 953, but Bradford did not seek U.S. Supreme Court review of the California Supreme Court's denial of his state habeas petition.

Nothing in *Loper Bright* supports Bradford's premise that, in addition to the Supreme Court's direct review of state criminal judgments and state habeas rulings (which is unaffected by AEDPA), the Constitution requires federal courts conducting collateral federal habeas review to provide an additional layer of de novo or independent review of state court judgments. In holding that "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires," *Loper Bright* relied on the "traditional understanding," dating back to the Founding, that federal courts must resolve questions of law "independent of influence *from the political branches*." *Loper Bright*, 603 U.S. at 385, 387, 412 (emphasis added). But there is no comparable historical tradition supporting the exercise of federal court de novo review in undertaking collateral review of state court judgments in criminal cases. On the contrary, as the Supreme Court has explained, federal habeas corpus review of detention of *state* prisoners was not even "generally available" "until 1867," and "it was not until well into th[e] [20th] century that th[e] [Supreme] Court interpreted" the federal habeas statute "to allow a final judgment of conviction in a state court to be collaterally attacked on habeas." *Felker v. Turpin*, 518 U.S. 651, 663 (1996). Moreover, "[a]t the founding, a sentence after conviction by a court of competent jurisdiction was in *itself* sufficient cause for a prisoner's continued detention." *Jones v. Hendrix*, 599 U.S. 465, 483 (2023) (simplified); *see also id*. (stating that, at the founding, "a habeas court had no power to look beyond the judgment to re-examine the charges on which it was rendered for substantive errors of law" (simplified)). Thus, a federal habeas court traditionally could grant relief only "if the court of conviction lacked jurisdiction over the defendant

or his offense." *Brown v. Davenport*, 596 U.S. at 129.  It was not until the Supreme Court's decision in *Brown v. Allen*, 344 U.S. 443 (1953), that "[t]he traditional distinction between jurisdictional defects and mere errors in adjudication no longer restrained federal habeas courts," leading to a "post-*Brown* habeas boom" in which "[f]ull-blown constitutional error correction became the order of the day." *Brown v. Davenport*, 596 U.S. at 130, 132.  Put simply, Bradford's contention that the post-*Brown* regime of de novo collateral review of state court final judgments is actually a longstanding "core Article III function" lacks any support in the historical record or in Supreme Court caselaw.

Bradford's argument further falters because it ignores "Congress's authority to make . . . rules" that "'narrow the discretion that individual judges can freely exercise'" in habeas corpus proceedings.  *Crater*, 491 F.3d at 1127 (emphasis omitted) (quoting *Lonchar v. Thomas*, 517 U.S. 314, 322 (1996)).  Because "the power to award the writ by any of the courts of the United States, must be given by written law," *Ex parte Bollman*, 8 U.S. 75, 94 (1807), the Supreme Court has held that "judgments about the proper scope of the writ are 'normally for Congress to make.'" *Felker*, 518 U.S. at 664 (quoting *Lonchar*, 517 U.S. at 323).  Congress's judgment that federal habeas courts should apply deferential standards in collaterally reviewing a state court's resolution of a federal claim "falls well within Congress's constitutional and historical authority to regulate habeas relief." *Crater*, 491 F.3d at 1127.

Accordingly, AEDPA's requirement that a federal habeas court must apply a "highly deferential standard" in reviewing a state court's resolution of a federal constitutional claim raises no constitutional concerns under *Loper Bright* or otherwise.  *Burt*, 571 U.S. at 18.  *Loper Bright* therefore

provides us no license to depart from AEDPA's settled meaning, and we remain bound by the Supreme Court's longstanding interpretation of AEDPA's standards, as well as by our prior precedent holding that AEDPA's deferential review is constitutional. *See Crater*, 491 F.3d at 1130 ("holding that § 2254(d)(1) is constitutionally firm"); *see generally Miller v. Gammie*, 335 F.3d 889, 899–900 (9th Cir. 2003) (en banc) (stating that a three-judge panel remains bound by Ninth Circuit precedent unless it is "clearly irreconcilable" with "intervening higher authority").

## IV

Having confirmed that AEDPA's deferential standards remain applicable, we turn to evaluating the California Supreme Court's decision under those standards.

In its order denying Bradford's habeas petition, the California Supreme Court stated, without elaboration, that Claims 4 and 8 (among others) were "denied on the merits." As the U.S. Supreme Court has held, AEDPA's deferential standards apply "even where there has been a summary denial." *Pinholster*, 563 U.S. at 187 (citing *Harrington v. Richter*, 562 U.S. 86, 98 (2011)). In order to show that an unexplained summary denial was "unreasonable," the petitioner must show that "there was no reasonable basis" for the state court's decision. *Id*. at 187–88 (citation omitted). In evaluating such a contention, the federal "habeas court must determine what arguments or theories *could* have supported the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of th[e] [Supreme] Court." *Id*. at 188 (emphasis added) (simplified). "If such

disagreement is possible, then the petitioner's claim must be denied." *Sexton v. Beaudreaux*, 585 U.S. 961, 965 (2018).

## A

In applying these standards, we must first address the parties' dispute as to what facts we must accept as true for purposes of evaluating the California Supreme Court's summary denial of Claims 4, 8(A), and 8(B).

## 1

*Pinholster* confirms that, in "determin[ing] what arguments or theories could have supported the state court's decision," we must consider the California Supreme Court's ruling in light of the state procedural framework through which that court reviewed the federal constitutional claims presented in Bradford's state habeas petition. 563 U.S. at 188 (simplified). As the U.S. Supreme Court has explained, "[u]nder California law, the California Supreme Court's summary denial of a habeas petition on the merits reflects that court's determination that 'the claims made in th[e] petition do not state a prima facie case entitling the petitioner to relief.'" *Id*. at 188 n.12 (second alteration in original) (quoting *In re Clark*, 855 P.2d 729, 741–42 (Cal. 1993)). In deciding whether a "prima facie case for relief is stated," the California Supreme Court "ask[s] whether, assuming the petition's factual allegations are true, the petitioner would be entitled to relief." *In re Figueroa*, 412 P.3d 356, 364 (Cal. 2018) (citation omitted). If the answer is yes, then the petitioner has met his "heavy burden initially to *plead* sufficient grounds for relief," and the California Supreme Court will issue an "order to show cause" requiring the state custodian to file a formal response to the petition, which is

"called a return."[11]  *Id*. (citation omitted).  If the State in its return disputes the petitioner's allegations, he will then have the burden "to *prove* them."  *Id*. (citation omitted).  But if the allegations of the petition, taken as true, are insufficient to show that "petitioner would be entitled to relief," *id*. (citation omitted), then the claims asserted in the petition fail on their merits, without the need to call for a return, and the petition will be summarily denied on the merits.[12]

---

[11] In deciding whether to call for a formal return from the State, the California Supreme Court may first call for an "informal response" from the State, to which the petitioner may then file a reply.  *See* CAL. RULES OF CT. 60 (2001 ed.); CAL. RULES OF CT. 8.385(b) (2026 ed.).    In Bradford's case, the State did file an informal response to his state habeas petition before the California Supreme Court issued its ruling summarily denying the petition.

[12] Citing our earlier decision in *Nunes v. Mueller*, 350 F.3d 1045 (9th Cir. 2003), we have previously raised a question whether a California court's denial of a habeas petition for lack of a prima facie case rests on the application of different *substantive* standards that fall short of a finding concerning the "underlying merits" of the claim.  *Montiel v. Chappell*, 43 F.4th 942, 956–57 (9th Cir. 2022); *see also Marks v. Davis*, 106 F.4th 941, 970–71 (9th Cir. 2024).  But as our above discussion makes clear, the substantive standards applied by the California Supreme Court in initially evaluating the merits of the claims in a petition are exactly the same as would be applied after issuing an order to show cause and receiving a response from the State.  What is different is that, in making the initial decision whether to call for a response, the California Supreme Court *takes the well-pleaded allegations of the petition as true* and, on that basis, applies the (identical) substantive standards in determining whether "the petitioner would be entitled to relief."  *Figueroa*, 412 P.3d at 364.  A summary denial is thus a determination that the underlying claims lack substantive merit—that is, it is fully "a decision on the merits and thus entitled to AEDPA deference."  *Ochoa v. Davis*, 50 F.4th 865, 888 (9th Cir. 2022); *see also Pinholster*, 563 U.S. at 187 & n.12 (reviewing California procedure on this point and squarely holding that a summary denial of a habeas petition is a decision on the merits that is entitled to AEDPA deference).  To the extent that anything in *Nunes*

It follows that, under *Pinholster*, we must undertake a "thorough review of the state-court record" that takes into account the allegations of the petition that the California Supreme Court would take as true under California law.  563 U.S. at 188 & n.12.  As noted in *Pinholster*, the California Supreme Court will not take "wholly conclusory allegations" as true.  *Id*. at 188 n.12 (citing *People v. Duvall*, 886 P.2d 1252, 1258 (Cal. 1995)).  In order for its allegations to warrant a presumption of truth as non-conclusory, a California habeas petition must set forth the "explanation of the basis" for its allegations by "stat[ing] fully and with particularity the facts on which relief is sought" and by including "copies of reasonably available documentary evidence supporting the claim, including pertinent portions of trial transcripts and affidavits or declarations."  *Duvall*, 886 P.2d at 1258 (citation omitted).  Moreover, because the allegations of the habeas petition must be framed against the background principle that "all presumptions favor the truth, accuracy, and fairness of the conviction and sentence," *id*. (citation omitted), the "allegations contained in the petition" must be "*viewed in the context of the trial record*."  *Marks*, 106 F.4th at 971 (citation omitted).  Consistent with that principle, Bradford's habeas petition in the California Supreme Court expressly incorporated by reference "all the records, documents and pleadings" in the trial court.

In applying these standards, however, we cannot read Bradford's petition de novo and analyze it as we might have if we were the California Supreme Court.  Instead, we must

---

might be read to support a contrary conclusion, any such suggestion did not survive the Supreme Court's decision in *Pinholster*, as we have repeatedly recognized.  *See Ochoa*, 50 F.4th at 888; *see also Montiel*, 43 F.4th at 957.  With this clarification, there thus remains no unresolved "tension between *Nunes* and *Montiel*."  *Marks*, 106 F.4th at 971.

consider how the California Supreme Court, in summarily denying Bradford's petition, *may reasonably have construed* the adequacy of his allegations under California law. And that remains true whether we view the adequacy and construction of Bradford's allegations in support of his federal claims as involving a "determination of the facts" by the California Supreme Court or an "application" of federal law to the facts of his case. 28 U.S.C. § 2254(d); *see also Nunes*, 350 F.3d at 1055–56.

Thus, for example, in *Waidla v. Davis*, 126 F.4th 621 (9th Cir. 2024), this court addressed petitioner Waidla's claim that his trial counsel was ineffective at the sentencing stage "for failing to offer admissible evidence showing that he had a good disciplinary record in pre-trial detention and that he had adjusted well to prison life." *Id*. at 643. In addressing "the arguments or theories that could have supported the state court's summary denial of this claim," *id*. (citing *Richter*, 562 U.S. at 103), we agreed with the State's contention that the California Supreme Court could have rejected the key document submitted in support of this contention "as hearsay" under California law, *id*. Because we "agree[d] that the California Supreme Court reasonably could have deemed this document inadmissible" under California law, we concluded that the document had to be disregarded for purposes of evaluating this claim. *Id*. We then considered the "remaining evidence offered in support of this claim" and concluded that "fairminded jurists could disagree" that that evidence was sufficient to establish the prejudice required to support Waidla's federal claim. *Id*. at 643–44. Accordingly, *Waidla* confirms that, in evaluating the allegations and materials included in Bradford's petition, we must consider how the California Supreme Court might

*reasonably* have evaluated their adequacy under the applicable California law standards.

**2**

We turn, then, to considering how the California Supreme Court might reasonably have evaluated, in the context of the trial record, the adequacy of the allegations and supporting materials in Bradford's petition under California law. In particular, we consider the State's contention that the district court erred in holding that the "California Supreme Court was obligated to accept" as true the allegations in Bradford's state habeas petition that (1) blood-alcohol-content testing was performed on the blood sample that was drawn from Bradford after the murder; and that (2) Bradford's counsel was not provided with those results and failed to request them. We conclude that the California Supreme Court could reasonably have concluded that Bradford's state habeas petition failed adequately to explain and support, as required by California law, its allegation that, "[o]n information and belief," blood-alcohol analysis was in fact conducted on Bradford's blood sample.

We note at the outset that the State either affirmatively concedes or cannot reasonably contest that the following facts about Bradford's blood sample were adequately pleaded and supported in Bradford's state habeas petition. *See supra* at 15–16. Based on the contemporaneous medical records submitted with the petition, a sample of Bradford's blood was drawn "at 6:32 a.m., twelve or thirteen hours after the crime, during [Bradford's] booking process." That blood sample was placed in a tube containing "an anticoagulant and preservative consisting of Potassium Oxalate . . . and Sodium Fluoride." According to a then-applicable guidance

sheet from the California Department of Justice Bureau of Forensic Services, blood samples taken for "Blood Alcohol or Drug Analysis" should be collected "in a gray stoppered tube (containing potassium oxalate/sodium fluoride)," whereas samples taken for DNA testing should be collected in a "lavender-stoppered tube (containing EDTA)." A year after that sample was drawn, the State filed a motion asking that a further blood sample be drawn from Bradford for DNA testing. At a subsequent hearing on that motion, the prosecutor explained on the record that, at the time of the initial draw, the person taking the sample had been "told to use a purple-stoppered tube (to indicate DNA testing), but instead used a gray-stoppered tube." As stated in a declaration submitted with Bradford's state habeas petition, whatever remained of the blood sample drawn from Bradford at the time of his arrest was mistakenly destroyed by the Los Angeles Police Department in May 1993, while his case was still on direct appeal to the California Supreme Court.

It is also established in the underlying trial record—and not disputed by either side—that Bradford's blood sample underwent (at least) serological testing to determine his blood type, because the State introduced the results of that testing at trial. The record undisputedly does not contain any indication that the trial court ever acted upon the State's motion for a second blood sample for DNA-testing purposes or that any DNA testing of Bradford's blood was ever performed. A declaration submitted with Bradford's reply to the State's informal response to his state habeas petition, *see supra* note 11, stated that a review of trial counsel Cohen's files, as well as those of Bradford's appellate and state habeas counsel, did not disclose "any documents reflecting

testing of blood samples taken from Mark Bradford for blood alcohol content."[13]

In light of the foregoing facts that the parties either do not or cannot dispute, the California Supreme Court could reasonably have concluded that Bradford failed to support his petition's allegation—made on "information and belief"—that blood-alcohol-content testing of Bradford's blood *had in fact been done*.  Although, as Bradford contends, the use of a gray stoppered tube containing potassium oxalate and sodium fluoride to draw Bradford's blood after his arrest reflects the standard procedure for blood-alcohol and drug testing, the prosecutor stated at a pretrial hearing that this use of a gray-stoppered tube was a mistake, because the sample was supposed to have been placed into a purple-stoppered tube for DNA testing.  The California Supreme Court could reasonably have concluded that it was entirely speculative that the blood sample—which had apparently been drawn for a different purpose—was nonetheless actually processed for blood-alcohol content anyway.  The only testing that the record confirms was actually done on the sample was serological testing that revealed that Bradford has B-type blood.  Bradford points out that the prosecutor, at the pretrial hearing concerning the second blood-sample motion, indicated that "standard tests" had "already been done in this case" on the prior sample, but the California Supreme Court could reasonably have concluded that Bradford failed to provide non-speculative

---

[13] We grant Bradford's unopposed motion to take judicial notice of this declaration, which was part of the record before the California Supreme Court but was erroneously not submitted to the district court.  *See Pinholster*, 563 U.S. at 181 (holding "that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits").

factual support for concluding that these "standard tests" included blood-alcohol-content testing.  Indeed, at the same hearing, the prosecutor stated that the second sample would be used for "*further* genetic testing with regard to the evidence in this case" (emphasis added), suggesting that the "standard testing" that had already been performed was for identification purposes (such as blood type) rather than toxicological purposes (such as blood-alcohol content).

No other evidence in the record suggests that blood-alcohol-content testing was ever performed on the blood sample that was drawn when Bradford was arrested. Accordingly, the California Supreme Court could reasonably have concluded that the State was correct in its informal response to Bradford's habeas petition when it argued that, "[o]ther than petitioner's 'information and belief,' there is no evidence" that results of a blood-alcohol-content test on the "blood sample taken from petitioner ever, in fact, existed." Put another way, the California Supreme Court could reasonably have concluded that, on this factual point, Bradford had not carried his "heavy burden initially to *plead* sufficient grounds for relief." *Figueroa*, 412 P.3d at 364 (citation omitted).

Based on the foregoing, we conclude that the district court erred in holding that "the California Supreme Court was obligated to accept . . . as true" Bradford's information-and-belief allegation that his blood sample had been tested for blood-alcohol content and that those actually-existing results were not provided to defense counsel.

## B

Having resolved this threshold issue concerning the facts that must be accepted as true for purposes of federal habeas review, we must consider the possible arguments that could

have supported the California Supreme Court's rejection of Bradford's *Brady* claim (Claim 4) and his relevant ineffective assistance claims (Claims 8(A) and 8(B)).

1

"To establish that a *Brady* violation undermines [his] conviction," Bradford "must make each of three showings: (1) the evidence at issue is favorable to [him], either because it is exculpatory, or because it is impeaching; (2) the State suppressed the evidence, either willfully or inadvertently; and (3) prejudice ensued." *Skinner*, 562 U.S. at 536 (simplified); *see also supra* at 29. In his state habeas petition, Bradford's *Brady* claim rested exclusively on his contention that the State had suppressed the results of blood-alcohol-content testing that had actually been conducted on Bradford's blood sample. Because, as we have explained, the California Supreme Court could reasonably have concluded that Bradford failed to provide sufficient factual support for his allegation that such blood-testing results existed, that court could likewise have reasonably concluded that the sole factual predicate for Bradford's *Brady* claim was wholly vitiated. It necessarily follows that, in summarily denying Bradford's petition, the California Supreme Court could reasonably have concluded that Bradford's *Brady* claim failed on the merits.[14] In short,

---

[14] Citing *United States v. Price*, 566 F.3d 900 (9th Cir. 2009), Bradford argues that, as a matter of federal law, he presented sufficient facts to "support[] the inference that the government failed to disclose" actual blood-alcohol-content testing results and to therefore require the State to "demonstrate that the prosecutor satisfied his duty to disclose all favorable evidence known to him or that he could have learned from others acting on the government's behalf." *Id*. at 910 (simplified). However, for the reasons that we have explained, the California Supreme Court could reasonably have concluded otherwise, and under AEDPA's deferential standard of review, we may not disturb that conclusion.

Bradford has failed to show that, as to his *Brady* claim, "the state court blundered so badly that every fairminded jurist would disagree with the decision." *Klein*, 607 U.S. at 221 (simplified).

**2**

To establish his claim of ineffective assistance of counsel in his state habeas petition, Bradford had to show (1) that Cohen's "representation fell below an objective standard of reasonableness"; and (2) that he suffered prejudice as a result, meaning that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 687–88, 694. *Strickland* imposes a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *id.* at 689, and AEDPA adds an additional layer of deference by framing the inquiry as whether "there *is any reasonable* argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105 (emphasis added); *see also Knowles*, 556 U.S. at 123 (explaining that a "doubly deferential" standard of review thus "applies to a *Strickland* claim evaluated under the § 2254(d)(1) standard").

For the same reasons discussed earlier with respect to Bradford's *Brady* claim, the California Supreme Court could also reasonably have concluded that Bradford's relevant ineffective assistance claim (Claim 8(B)) fails to the extent that it rests on defense counsel's asserted failure to request blood-testing results that had actually been done. That is, given that the California Supreme Court could reasonably have found that Bradford had not adequately pleaded the actual existence of blood-alcohol-content testing results, that court could also reasonably have concluded that Bradford's

counsel (Cohen) was not ineffective in failing to request such non-existent records.

### 3

Bradford's ineffective assistance claims in Claims 8(A) and 8(B), however, were not limited to the contention that Bradford's counsel had failed to request blood-testing results that were assertedly in the State's possession. These claims relied on the further assertions that Bradford's counsel was ineffective in failing (1) to request Bradford's time-of-arrest blood sample and arrange to have it tested (the remaining aspect of Claim 8(B)); and (2) to investigate and present certain additional evidence of Bradford's intoxication or mental impairments at the time of the murder (Claim 8(A)).[15] Because these claims do not depend upon the existence of blood-alcohol-content test results, they cannot be said to fail for the same reason as the claims we have already discussed. We therefore address the merits of these claims, applying AEDPA's deferential standards.

We conclude that, even assuming *arguendo* that Bradford's counsel performed deficiently in failing to investigate and present additional evidence concerning Bradford's intoxication and mental condition at the time of the murder, the California Supreme Court could reasonably

---

[15] We reject the State's contention that Bradford's Claim 8(A) was limited to an allegation that Bradford's counsel failed to pursue a "diminished capacity defense," which the State notes was abolished in California years before the murder. *See* CAL. PENAL CODE § 25(a) (adopted June 8, 1982). Claim 8(A), as presented to the state court, explicitly alleged that the failure to investigate and develop additional evidence concerning Bradford's intoxication and mental state was prejudicial because that evidence was therefore not presented "to the jury that decided whether Mr. Bradford *had the requisite mental state* for the murder conviction and special circumstance findings" (emphasis added).

have determined that Bradford had nonetheless failed to establish prejudice. Even if Bradford's counsel had presented at trial the additional evidence described in the state habeas petition—*i.e.*, evidence indicating that Bradford had consumed a very large amount of alcohol before the murder, that he had a very high blood-alcohol content at the time of the murder, and that he was also then suffering from underlying mental impairments—the California Supreme Court could have reasonably concluded that none of this evidence would create a "reasonable probability" of a different outcome. *Strickland*, 466 U.S. at 694.[16]

At Bradford's trial, the jury was specifically instructed that it should consider evidence of Bradford's intoxication in determining whether he had the relevant mental state for first-degree murder, which required proof that he acted willfully and with deliberation and premeditation. The jury was also instructed that, to establish the relevant special circumstance, the State had to prove that Kokes was "*intentionally* killed for the purpose of preventing her testimony in a criminal proceeding" (emphasis added). The most powerful evidence of Bradford's deliberation, premeditation, and intent fell into two categories. First, Bradford expressly admitted in his confession that he had in fact deliberated about whether to kill Kokes and that, due to his fear that she would "rat[] [him] off," he wanted to go back with the knife to "mak[e] sure she was dead." *See supra* at 10. Second, there was overwhelming evidence that

---

[16] For the same reasons, we also conclude that, even if the State did suppress actually existing blood-alcohol-content test results, *but see supra* section IV(B)(1), the California Supreme Court could reasonably have rejected Bradford's *Brady* claim on the alternative ground that Bradford had failed to show "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Strickler*, 527 U.S. at 280 (citation omitted).

corroborated several aspects of Bradford's confession and that further confirmed the deliberative nature of his conduct in returning to Kokes's apartment to stab her. In particular, Bradford's statements that he initially went back to his apartment, took a shower, retrieved one of Beerman's knives, and then returned to Kokes's apartment were strongly corroborated by Beerman's and Stevens's testimony. Beerman testified about finding the knife, which he recognized as his, in two separate pieces—he found the handle in the bathroom of their apartment, and he discovered the blade among Bradford's laundry in the laundry room. Stevens confirmed that, in the relevant time frame, he encountered Bradford in the hallway with wet hair and a towel. *See supra* at 10–11. This corroborating evidence of Bradford's objective actions supports a strong inference that Bradford had sufficient time to deliberate and that he planned his actions in returning to Kokes's apartment with Beerman's knife.

Given this strong evidence of deliberation and premeditation, the California Supreme Court could reasonably have concluded that any of the proffered additional evidence about Bradford's intoxication or mental defects would not have created a reasonable probability of a different outcome. To the extent that such evidence had any probative force, it would be to support a potential inference that Bradford's intoxication and mental impairments were so substantial that the jury should entertain a reasonable doubt as to whether he acted with premeditation and deliberation. But the California Supreme Court could reasonably have concluded that any such inference or reasonable doubt was decisively refuted by the record evidence recounted above. In particular, the California Supreme Court could reasonably have concluded that the proffered additional testimony about

Bradford's impairments would not have meaningfully detracted from the direct testimony about what actions Bradford was *actually able to take* and what Bradford *actually recalled* about those actions and why he took them. *See, e.g.*, *Waidla*, 126 F.4th at 626–27, 638–39 (holding that "[f]airminded jurists could conclude that . . . there was no reasonable probability" the petitioner suffered any prejudice from counsel's failure to investigate and present a defense that he was merely a bystander to the murder, because he had confessed that he struck the victim with a hammer while his co-conspirator stabbed the victim to death); *see also Montiel v. Chappell*, 43 F.4th 942, 963 (9th Cir. 2022) (holding that the petitioner suffered no prejudice from counsel's failure to present expert testimony regarding the effect of hallucinogenic drugs on his ability to "harbor the specific intent for robbery or murder," in part because the "manner of killing" and the incriminating statements the petitioner made "suggest[ed] that [he] was aware of his actions" (citation omitted)); *Crittenden v. Ayers*, 624 F.3d 943, 960–62 (9th Cir. 2010) (holding that the method of the murder was highly probative of deliberation and premeditation and therefore rebutted any inference that counsel's failure to present a mental state defense prejudiced the petitioner).

Bradford's various arguments to the contrary are unpersuasive. First, Bradford argues that expert testimony regarding his mental impairments—which he asserts made him particularly "susceptible to influence, manipulation and control" by "authority figures such as police officers"—could have swayed the jury to question the reliability of his confession. However, several features of Bradford's confession could have led the California Supreme Court to reasonably conclude otherwise. In particular, Bradford's most incriminating answers were made in response to open-

ended questions by the officers, such as when, in response to the question "What were you thinking about?" (after he returned to his room following the initial attack on Kokes), Bradford stated, "If she was gonn[a] live, you know, and ratting me off." Bradford notes that the officer had earlier asked Bradford about whether he had such a worry about Kokes "telling about" him when he first left Kokes's room, and Bradford argues that this earlier question demonstrates that Bradford's later response to the different question about his thoughts after returning to his room was coached. The district court accepted this tendentious reading of Bradford's interview, but in doing so it flatly disregarded AEDPA's deferential standard of review. And to the extent that Bradford suggests that trial counsel should have bolstered the inference of coaching by presenting a more complete picture of Bradford's prior statements to police, the California Supreme Court could reasonably have concluded that (1) counsel's successful suppression of two of Bradford's earlier incriminating interviews was a better defense strategy; and (2) any weak inference of coaching from evaluating all of Bradford's statements would have been outweighed by the more powerful competing risk that the jury would conclude that the multiple confessions reinforced one another and confirmed Bradford's guilt.

Second, Bradford argues that additional evidence of his intoxication and mental impairments would have undermined the reliability of his confession, because such evidence would have underscored the extent to which that confession was "replete with examples of memory gaps, inability to sequence events, and inability to explain the reasoning behind his actions." But this selective approach to assessing the matter is again inconsistent with AEDPA's standard of review. Even if further evidence of intoxication

and mental impairments would have shown that Bradford's thinking and recall were impaired in some respects, the California Supreme Court could reasonably have concluded that the confession nonetheless confirmed Bradford's ample recall of the most crucial aspects of the murder. Many of the details that Bradford could not recall related to the initial assault of Kokes before he first left for his apartment, rather than to the subsequent stabbing and murder after Bradford returned to Kokes's apartment. Bradford could not recall, for example, what time the initial attack occurred; why he took certain items from Kokes's apartment after the assault but left others; whether he had done anything to Kokes's nipples; or whether she was wearing underwear when he raped her. By contrast, the only notable detail Bradford could not recall in relation to the murder itself was the number of times he stabbed Kokes. The California Supreme Court could reasonably have determined that the proffered additional evidence of mental impairment would not have undermined the reliability or adequacy of his confession in respects relevant to his premeditation and deliberation.

Third, Bradford contends that counsel's failure to present additional evidence of intoxication and mental impairments prejudiced the defense's ability to respond to the prosecutor's claim, in her initial closing argument, that "there is no evidence whatsoever that [Bradford] was intoxicated." Viewed in context, however, the prosecutor's statement could reasonably be construed as referring, not to a complete absence of any alcohol-related effects, but to the more specific point that there was an insufficient basis for concluding that Bradford was so intoxicated that, as the prosecutor stated, "he couldn't form any of the specific intents to do any of the crimes that he did." Likewise, in rebuttal argument, the prosecutor emphasized how the

defense theory of intoxication was inconsistent with the level of relevant detail in Bradford's confession. *See supra* at 17–18. The California Supreme Court could reasonably have concluded that there was no reasonable probability that any of the additional evidence Bradford references would have altered the jury's conclusion with respect to Bradford's mental state.

Accordingly, we hold that the California Supreme Court could reasonably have determined that Bradford was not prejudiced under *Strickland* by Cohen's failure to present, at the guilt phase, the additional evidence of intoxication and mental impairment described in Bradford's state habeas petition. On that basis, we conclude that the remaining aspects of Claims 8(A) and 8(B) were properly rejected by the California Supreme Court. And because that conclusion is fully sufficient to require the denial of Bradford's habeas petition with respect to those claims, we need not reach the question of whether, under *Coleman*, Bradford made a sufficient showing of prejudice to excuse his procedural default of those claims in state court. *See Lambrix*, 520 U.S. at 525; *Lewis*, 95 F.4th at 1185 n.11; *see also supra* section II.

## V

For the reasons we have explained, the district court's judgment granting Bradford's habeas petition and vacating his first-degree murder conviction and the special-circumstance finding is reversed. The only remaining question concerns the scope of any claims left for remand. Bradford contends that, if we reverse the district court's judgment, we "must remand to the district court for consideration of guilt-phase Claims 8(C), 8(D), 8(E), and 8(G), which were dismissed as moot" by the district court

and which addressed other aspects in which trial counsel's performance at the guilt phase was allegedly ineffective. We disagree.

In its initial judgment entered on December 4, 2015, the district court denied Bradford's petition *in full* "[i]nsofar as the Petition challenges the judgment of conviction for first-degree murder, first-degree robbery, rape, and sodomy in the case of *The People of the State of California v. Mark Alan Bradford*, Case No. A820582, in the Superior Court for Los Angeles County." In that 2015 judgment, the district court granted relief *only* with respect to "the judgment of conviction on the special circumstances, and the sentence of death" in Bradford's case. Thus, as we noted in *Bradford I*, the district court had entered judgment rejecting all of Bradford's guilt-phase claims (including Claims 2–12). *See* 923 F.3d at 609. On appeal, Bradford challenged, *inter alia*, the district court's holding that Claim 8 (ineffective assistance of counsel) had been procedurally defaulted in state court. *See id*. at 608–09. However, in his briefs in this court, Bradford argued that he could show the requisite cause and prejudice to excuse his procedural default of Claim 8 *solely* as to the subclaims regarding his trial counsel's asserted failure to investigate and present evidence concerning intoxication (including blood-alcohol results) and mental impairments—*i.e.*, Claims 8(A) and (B). *See* Petitioner-Appellant's First Cross-Appeal Brief at 31–44 (No. 15-99018); Petitioner-Appellant's Response and Reply Brief on Cross-Appeal at 49–53 (No. 15-99018). Bradford's briefs in the prior appeal thus never sought any relief from the district court's adverse judgment with respect to Claims 8(C)–(G), and those claims were therefore abandoned. *See Bolin v. Davis*, 13 F.4th 797, 809 n.4 (9th Cir. 2021). Accordingly, Claims 8(C)–(G) were not embraced within

our remand of Claim 8 to the district court. And because we have now rejected, on the merits, Claims 8(A) and 8(B), as well as Claim 4 (the only other claim we remanded in the prior appeal), all guilt-phase claims have now been resolved adversely to Bradford.

We agree with Bradford, however, that his remaining *penalty-phase* claims (Claims 13 through 29) remain to be resolved on remand. In its 2015 judgment, the district court granted habeas relief setting aside Bradford's sentence on one ground (Claim 1) but without ever reaching Claims 13–29. Moreover, in requesting entry of that judgment, Bradford specifically noted that the district court's vacatur of his sentence on other grounds "mooted" Claims 13–29. After we reversed the district court's vacatur of Bradford's death sentence and remanded, the district court subsequently set aside Bradford's first-degree murder conviction entirely, thereby again mooting the remaining penalty-phase claims. Because we have reversed that grant of relief, and all habeas relief concerning Bradford's conviction has now been denied, these unresolved penalty-phase claims remain to be decided on remand.

## VI

For the foregoing reasons, we reverse the district court's grant of habeas relief on Claims 4 and 8 and remand with instructions for the district court to enter an order denying Bradford's habeas petition in its entirety insofar as it challenges (1) his judgment of conviction for first-degree murder, rape, and sodomy; (2) the special circumstance findings; and (3) the judgment of conviction on the special circumstances. We remand for further proceedings consistent with this opinion, with proceedings to be limited

solely to the resolution of any remaining aspects of Bradford's Claims 13 through 29.

**REVERSED AND REMANDED.**